| 12 | 25 |
|----|-----|
| 45 | 395 |

## P. E. TRASTOUR *v.* B. FALLON et als.

The defendants were appointed a " Permanent Committee " to forward a scheme proposed at a public meeting of the citizens of New Orleans, of establishing a railway across the Isthmus of Tehuantepec, and in that capacity contracted with the plaintiff. It was held that the burden of proof, as to the terms of the contract, rested upon the plaintiff, and that to hold the defendants liable, he must show that he contracted with them personally, or that they misled him by assuming to act for others without sufficient authority.

In cases of this character, the controlling question is, whom did the employee trust? If no artifice or deception was used in making the contract, and the employee knew the capacity in which his immediate employer acted and looked to a special fund or to a projected company to reward him, he cannot hold the honest agent personally liable.

APPEAL from the Fourth District Court of New Orleans, *Reynolds*, J. Tried by a jury. *J. Seghers*, *J. L. Tissot* and *W. D. Hennen*, for plaintiff and appellant. *J. P. Benjamin*, for defendants.

. SPOFFORD, J. In the fall of 1849, the attention of this section of the United States, and especially of the city of New Orleans, was directed to the project of establishing a communication between the Atlantic States and our new possessions on the Pacific coast, by means of a railway across the Isthmus of Tehuantepec. A privilege conceded by the Government of Mexico to *Señor Don José de Garay*, was supposed by many to afford greater facilities for the contemplated work than could be obtained in any other mode.

A public meeting of the citizens of New Orleans was held to devise ways and means for furthering this project, which was supposed to promise great advantages to the city, by bringing to it a new tide of commerce and travel. The meeting appointed a " Permanent Committee " of twenty-one citizens of New Orleans to take charge of the business and to forward the scheme.

This committee held frequent meetings, of which they kept a record open to public inspection; entered into correspondence with parties interested in the Garay grant, and procured subscriptions to defray preliminary expenses incurred for the purpose of informing themselves and the public as to the advantages of the proposed line of transit.

4

TRASTOUR
v.
FALLON.

Their own services appear to have been gratuitously given, and the object of their appointment by the citizens, as interpreted by the whole course of their procedure, was to awaken interest in the subject of a Tehuantepec railroad, to demonstrate its facility, to procure the advantages of the Garay grant for New Orleans, and to lead to the organization of a company in Louisiana, which, availing itself of the privileges of the grant for which negotiations were to be made, should finally achieve the great enterprise of connecting the two oceans by this route.

It appears by the journal of the Permanent Committee that, early in 1850, they succeeded in making a conditional arrangement with *Mr. P. A. Hargous*, of New York, (who had become the assignee of the Garay grant,) by which the latter agreed to transfer the grant with all its privileges to a few citizens of New Orleans, to be by them held in trust for a company to be organized as soon as it should become practicable, with a capital of nine millions of dollars, one-third of which was to belong to *Mr. Hargous* as the consideration of the transfer; two years were given from the date of the agreement, within which the railroad company was to be organized, and in default of such organization, the grant was to revert to *Hargous*.

A sub-committee called the "Managing Committee," was appointed by the "Permanent Committee," who constantly reported to the latter their proceedings for approval.

Early in 1850, steps were also taken by the Permanent Committee to have an authentic survey of the Isthmus of Tehuantepec made with reference to the future location of a railroad. The committee were anxious to procure a government engineer of general reputation to take charge of this survey, in order to inspire confidence in his report. At length, they succeeded in securing a promise of the services of *Major Barnard*, of the United States Engineer Corps. His mission was to make a thorough survey of the whole route, and he was to be provided with the requisite assistance and materials; but his departure was postponed to the end of the rainy season in the fall.

Meanwhile, it was proposed to employ the plaintiff *Trastour*, an engineer by profession, to make a preliminary survey for certain special objects. *Trastour* had previously been upon the Isthmus and had prepared certain maps which, at their instance, he exhibited and explained before the Permanent Committee. Being a resident of New Orleans, he had also, at the solicitation of the Permanent Committee, been appointed by the Governor of Louisiana a delegate to a general convention held in the spring of 1850 at Memphis to promote the cause of internal improvements, with reference to a more complete intercourse with our possessions on the Pacific—an appointment which he accepted.

The only contemporaneous evidence of the engagement of the committee with *Trastour*, is contained in the following minutes of their proceedings, at a meeting held upon the 6th June, 1850.

"*Mr. Benjamin* communicated the object of the calling of this meeting, which was to report that the Managing Committee, of which he is Chairman, had concluded that it would be interesting and highly advantageous to send a mission immediately to the Isthmus to obtain all information about the Pacific coast, the point most disattended and hardly commented upon in the surveys, memoirs and sources of information that have been attainable, and yet a point most necessary to be known for the prosecution of the undertaking. *Mr. Benjamin* represented that the acquisition of this knowledge would be very valua-

ble before expediting or organizing a survey for fuller service, or taking any other material action in the matter. Also, that *Mr. Trastour* had engaged to accomplish the desired object, making all arrangements himself, and at a cost of about $5000, to the committee, and four months time.

"On this point being referred by the Chairman to the committee, it was unanimously decided that *Mr. Trastour* should be engaged for the service professed by him, and that the funds raised by subscription among our citizens, and existing in the Treasurer's hands, should be applied for that purpose.

"*Mr. Benjamin* further stated that *Mr. Trastour* had informed him of the desire of *Dr. Kovaleski*, a scientific and worthy gentleman, well known to *Mr. Trastour*, to accompany the latter in his expedition, provided expenses only were defrayed by him, and estimating them at $300 to $500.

"The Chairman having asked the sense of the committee, consent was unanimously given, with full consideration of the advantages that might be obtained by the accompaniment of the Doctor to the expedition of *Mr. Trastour*."

By the report of the Treasurer of the committee, of date 15th October, 1850, it appears that, out of $9455 subscribed by liberal individuals as a preliminary fund to forward the purposes for which the citizens of New Orleans had appointed this committee, $5000 had been paid to *Trastour*, $500 to his wife and $300 to *Dr. Kovaleski*.

To pay for the expenses of *Major Barnard's* survey, which was to be more costly and complete, a *projet* of an organization in the form of a company, as agreed upon with *Hargous*, was, at a later day, drawn up ; and the subscribers to its stock entered into the express stipulation to pay in cash five dollars per share at the time of their subscription, the money to be devoted to the purposes of *Major Barnard's* expedition.

Meanwhile, on the 13th June, 1850, *Trastour* had departed from New Orleans to make his preliminary survey of the Isthmus. He was gone nearly twelve months, instead of four, and expended an amount considerably above that expressed in the conditions of his undertaking, as recorded in the minutes of the Permanent Committee. This occasioned trouble to the committee, who complained to *Trastour*, but at the same time they acknowledged the very meritorious nature of his services, and gave directions to *Major Barnard* who went out in the winter of 1850, to assume his contracts so far as practicable, and to relieve him from the embarrassments occasioned by his having gone in debt beyond the funds placed at his disposal. He was also offered a place in the committee's service, under *Major Barnard*, which he seems to have declined, preferring to return with the notes and materials provided in his explorations, in order to construct the requisite maps and charts in New Orleans. His principal services upon the Isthmus consisted in the soundings of the Boca Barra, in ascertaining that La Ventosa, on the Pacific coast, was a safe and commodious port, and in surveying that coast from the Boca Barra to the village of Huamelulo.

In his journey he was exposed to many hardships, and he displayed throughout great fortitude, perseverance and scientific skill.

Immediately upon his return to New Orleans, he commenced the necessary work upon his maps and charts, and the expenses of assistants, as well as an office for the purpose, were, from time to time, advanced by the committee out of funds received by them in their official capacity.

*Major Barnard* and his party had not completed their survey when the Mexican Government, having taken an unexpected step in opposition to the validity of the Garay grant, drove them from the Isthmus.

A diplomatic correspondence between the Governments of Mexico and of the U. States ensued, the committee still having hopes that the Garay grant would be finally sustained, until late in 1852, when every prospect of prosecuting the original scheme of a railroad under the grant appears to have failed, and they abandoned it to *Hargous*, and turned their attention to the subject of procuring an indemnity from the Mexican Government for past outlays by the citizens of New Orleans. In this also they failed. In August, 1852, *Mr. Trastour* was notified that as the proposed Tehuantepec Company had been subjected entirely to political negociations, the issue of which it was necessary to wait, and as the funds were exhausted, he must suspend work in the service of the committee.

In March, 1854, *Trastour* brought the present suit against the members of the Permanent Committee and their Secretary *B. Fallon* personally, claiming of them *in solido* $116,546 72, as a balance due for his services aforesaid.

The case of *Fallon* was tried first and separately before a jury. It resulted in a verdict and judgment in his favor, and the plaintiff waiving the jury as to the other defendants, there was judgment in their favor, and the plaintiff has appealed from both judgments.

He declared upon an express contract, but he seeks to recover upon a *quantum meruit*.

The burden of proof, as to the terms of the contract, is upon the plaintiff. To hold the defendants liable, he must show that he contracted with them personally, or that they misled him by assuming to act for others without sufficient authority.

We find no evidence whatever of an engagement on the part of the defendants in their personal capacities, to pay the plaintiff anything. Indeed, the argument of his counsel seems to waive this point and to rest wholly upon the assumption that their personal liability flows as a legal consequence from their having assumed to act for an irresponsible principal.

The extract we have already made from the minutes of the Permanent Committee, is the written evidence of their original contract introduced by *Trastour* himself. This repels every inference of a personal obligation assumed by the members of the committee. It recites the estimated cost of the work for which *Trastour* was employed, and designates the special fund which was to meet the cost. If the committee had appropriated that fund otherwise, they would then have become liable themselves to *Trastour* for the amount thus diverted from his use. But they did more for him than they engaged to do. He not only received the fund on hand at the time of his engagement, but he and his *employés* were paid large sums besides, collected from other subscriptions. Between May, 1850, and August, 1852, his own account shows that he received $15,578 85. He states that of this sum he disbursed for necessary expenses $12,615 55, and used privately only $2,963 28.

But the question is not whether the plaintiff's time and services were worth a more liberal compensation, but whether the committee have complied with the contract they made with him.

After judgment in the court below, upon a motion for a new trial, the plaintiff seems to have taken a position somewhat inconsistent with his petition, to

wit: that he made two distinct contracts at different times with the defendants, one to survey the Isthmus, and another to supply the maps and charts. But his petition refers to but one contract, and speaks of the maps and charts as necessary to show the result of the survey. And his allegation is that the committee agreed not only to defray the expenses of the survey and supply his family with $100 per month while he was engaged in it, but to pay him besides for the survey and the charts necessary to embody its results, "such sums as they should be liberally worth, and also what should be a very high and extraordinary reward if he should succeed in discovering a good harbor for the terminus on the Pacific coast."

It is as to this latter portion of the alleged contract, the liberal compensation promised by the committee individually, and the extraordinary reward for discovering the port, that the evidence is entirely lacking.

Does the law imply such a promise from the contract which is proved?

That the plaintiff hoped to get a liberal reward in case of his own success, and that he would have obtained it if the grant had been sustained and the contemplated company successfully organized under it, we think is extremely probable. But he would have obtained it from the company so organized, not from the committee individually. Did the committee deceive or mislead him? We see no evidence of it.

All their proceedings were public and notorious. The representative capacity in which they acted was known to the plaintiff. Notwithstanding they were, individually, men of wealth, the plaintiff never seems to have applied to one of them to pay any portion of the claims out of his own pocket. If they had been contracting on their own account the "high and extraordinary reward" in case of his success, would have been stipulated at a fixed sum in the ordinary course of business dealings. The fact that it was left open in this loose manner shows that they were not binding themselves, but that the plaintiff was looking to the generosity of a future company, which every one was confident would be formed, but for which the committee could not promise. His whole intercourse with the committee confirms this view. We think it results from the evidence that he always looked to the fund and to the liberality of the future company to be benefited by his services, and that he never looked to the individual members of the committee until the whole scheme had exploded.

And in cases of this character, the controlling question is, whom did the *employé* trust? See Story's Agency, § 288. If no artifice or deception was used in making the contract, and the *employé* knew the capacity in which his immediate employers acted, and looked to a special fund or to a projected company to reward him, he cannot hold the honest agent personally liable. The minutes of the Permanent Committee, and the letters of the defendants *Fallon* and *Benjamin*, relied upon by the plaintiff as proofs of his contract, all show that he had no right to look to the members of the committee personally for a reward. His own letters advance no such pretension, even at a time when he had gone in debt beyond the sum appropriated to him, and he was most pressed for money. And the hopes held out to him occasionally by *Fallon* and *Benjamin*, as testified to by some of his witnesses, are evidently predicated upon the presumed success of the project of a company, or at least upon the expectation that an indemnity would be procured by our Government from the Government of Mexico, for what was supposed by the committee to be a breach of national faith and a violation of vested rights; and that some portion of this indemnity

would be appropriated to the plaintiff as a recompense for his skill and enterprise devoted to the furtherance of a brilliant but unsuccessful project.

Leaving out of view the testimony of *Fallon*, to the admission of which a bill of exceptions was reserved by the plaintiff, we do not find that a case of personal liability is made out against any of the defendants. Upon the competency of *Fallon* to testify for the other defendants, after a verdict in his own favor, we need not express an opinion.

The judgment of the District Court is, therefore, affirmed with costs.