HAMLIN, Justice ad hoc.
 

 Charles Edwin Buckley, a licensed realtor, brought this suit against Woodlawn Development Corporation to recover the sum of $3,250, alleged to be due him as a realtor’s commission on the sale of 487.25 acres of the Bob Harman Plantation, situated south of Monroe, Louisiana, owned by Woodlawn Development Corporation. In the alternative, he prayed for judgment against Earl J. Wills, individually.
 

 
 *667
 

 Plaintiff
 
 predicated his suit upon an exclusive listing contract
 
 [1]
 
 executed on March 24; 1954, by him and Earl J. Wills, who signed the contract as follows:
 

 “Woodlawn Development Corporation
 

 “Signed by: Earl J. Wills “Owner”
 

 On April 30, 1954, the property herein involved was sold to Louisiana Machinery. Company. Inc., for a consideration of $65,000. L. M. Ray, President and owner of approximately 80% of the stock of Woodlawn Development Corporation, signed the act of sale on behalf of said corporation, having been properly authorized to do so by the Board of Directors.
 
 [2]
 
 The
 
 *669
 
 amount plaintiff alleges is due him represents
 
 5%
 
 of this sale price.
 

 The trial court rejected plaintiff’s demand against Woodlawn Development Corporation, holding that there was no corporate authority in Earl J. Wills to execute the Exclusive Listing Contract on behalf of Woodlawn Development Corporation. The court rendered judgment against Earl J. Wills, personally and individually, on the alternative demand.
 

 Plaintiff appealed from the judgment in favor of Woodlawn Development Corporation, and Earl J. Wills later appealed from the judgment against him individually. We have for consideration cross appeals, which will be disposed of in one decree.
 

 Woodlawn Development Corporation was incorporated on August 16, 1947. Its purposes were varied, but, principally, it dealt with the development of residential property.
 
 [3]
 
 At the time of the trial of this matter, and during the years 1953 and 1954, Louis M. Ray held the office of president and controlled the business. In addition to Mr. Ray, there were two other stockholders, who owned only qualifying shares.
 

 
 *671
 
 During the month of June, 1953, the defendant Earl J. Wills, an attorney from Texas and a brother-in-law of Mr. Ray, accepted employment in Monroe, Louisiana, with Associated Contractors, Inc., a Louisiana corporation — the majority stock of which corporation was also owned by Louis M. Ray. With respect to Wills’ employment, Ray testified as follows:
 

 “
 
 * * * he was employed about two years ago with the idea of handling some legal matters and heavy legal work but it was determined after he had been there for some time — and I think to his choice that he didn’t want to do that kind of work and he was connected with the construction companies at which time he has stayed on the job from 2 to 3 months — on several different jobs 2 to 3 months at the rime devoting his entire efforts and work to those individual jobs and when the job was complete he would come back to the office and of course he was a straight time man and if he would be around the office, somebody would call up and want to see a lot why he would go out and show them a lot and some letter that come in that needed answering I would ask him sometime, Earl answer this letter, tell them so and so or something for me or just various things of that kind unless he was busy or something else and he has been on the payrolls of Associated Contractors, Inc. which is a heavy and general contracting firm we operate and also he has been employed by the Acme Wellpoint Corporation which is involved in subsurface water controls and works of that nature for sometime and he has also been employed — during March he wasn’t employed by either one, I think he was employed by Bain and Wolff Construction Company of which he is President and at no time —I can definitely state that at no time in the last two years or ever to my knowledge has he received a penny of compensation in the way of salaries, commissions or fees from the Wood-lawn Development Corporation.
 

 ifc ^ Sfc í¡í
 
 % %
 

 “It was my intentions to make an administrator out of him or an office assistant at the time I hired him but Mr. Wills is very much of an outdoor man and he likes construction work and just for one reason and another it did-n’t work out that way and he was never — has been able to qualify to handle legal work in the State of Louisiana and so it just drifted within the first two or three months, well he drifted off to these other angles of work.”
 

 Ray further testified that had Wills’ employment worked out as planned, he might have made him a vice president.
 

 The record reflects that Wills at times presented himself as Vice President of
 
 *673
 
 Woodlawn Development Corporation and that this was not unknown to its officers. The record further discloses that Wills had business cards, on which he listed himself as Vice President and General Counsel of L. M. Ray Construction Corporation, Associated Contractors, Inc., Woodlawn Development Corporation, and Acme Well-point Corporation — all of which corporations were controlled by L. M. Ray.
 

 Ray testified that he loaned Wills the money to buy Bain and Wolff, Inc. and that he subcontracted one of his jobs for Associated Contractors to Bain and Wolff, Inc. However, he further stated that he never empowered Wills to sign any documents for him.
 
 [4]
 

 The record shows that Woodlawn Development Corporation purchased the property herein involved in 1952 for subdivision purposes, which never developed. Ray stated that the corporation invested $95,000 in the property and that he finally realized that it would have to be sold at a loss.
 

 During March, 1954, Ray negotiated with a bank for a loan on some of the corporation’s property, and the bank asked the plaintiff, Charles Edwin Buckley, to make an appraisal. During an interview with Ray on March 23, 1954, at which Wills was present, Buckley approached Ray with respect to giving him an exclusive listing of the Bob Harman property for sale. Although Ray gave Buckley maps of the property and told him that a commission would be discussed if a prospect was found, he testified that he refused to give him a listing and his testimony is as follows:
 

 “I don’t specifically remember, however, I don’t deny giving him the maps but I don’t remember that but the meeting was concluded when I told him that he was — if he wanted to sell real estate and brought me a prospect he was perfectly all right to sell it and if” (he) “would have sold a lot up here— or some of my vacant lots for anywhere from $1,000.00 to $3,000.00 or even up to $5,000.00 on a vacant piece of property well I usually pay 5% but on a transaction as large as selling a house for $15,000.00 or $20,000.00 or a farm I just wouldn’t — I wouldn’t pay but 50% of the commission and that I wouldn’t give an exclusive listing under any consideration. If he found someone that was interested in any of my property he could bring them to me and tell me who his prospect was or — and I would give him a definite quotation on it and if he closed it out
 
 *675
 
 he was entitled to his commission, that’s it.”
 

 He further testified:
 

 “ * * * so I told Mr. Buckley that under those terms, sure he could— if he found a prospect for any of my property and sold it it would be perfectly agreeable with me that I would pay him a usual commission. That was at the meeting that lasted I guess 30 or 45 minutes talking about first one business and another and he left, that is the last I’ve heard of Mr. Buckley. I understand — the next day — I left town the next day — now I wouldn’t say specifically that it was the next day but it was within two or three days, one to three days after this meeting he came back out to my office and I was out of town.”
 

 The next day, March 24, 1954, Buckley again went to Ray’s office and found him to be out of town, but Wills was in the office and signed the Exclusive Listing Contract herein involved. Buckley then advertised the property for sale, on April 11, 12, 13, 14, 15, 20, 21-23, 25 and 26. He heard through an outside party that Mr. Carbone of the Louisiana Machinery Company, Inc. was interested in the property, and he called on him. He told Mr. Car-bone that he had an exclusive listing on the property but that he did not want him to hold back from purchasing because of the listing. When Buckley read of the sale of the property, he telephoned Ray and demanded his commission. Ray replied that he was unaware of the listing and that he would have to talk to Wills, who was out of town, “and see what the score is on that, I don’t know.” Upon receiving a definite answer, communicated by Wills, that he would not receive any commission, Buckley filed the present suit.
 

 To plaintiff’s petition, Woodlawn Development Corporation and Earl J. Wills filed a joint answer signed by counsel. Therein, they denied any authority on the part of Wills to execute the agreement on behalf of Woodlawn Development Corporation.
 

 Thereafter, Wills filed an amended answer, in which he denied the averments contained in his joint answer with Wood-lawn Development Corporation and admitted that he had represented to plaintiff that he had authority to sign the contract for the corporation. He then assumed the position of cross-plaintiff and prayed for indemnity against Woodlawn Development Corporation if he be held liable.
 

 Wills’ testimony is to the effect that he had authority from L. M. Ray to sign the contract, but that he did not know that it was an exclusive iisting contract and had told Buckley that it would not be exclusive. He stated:
 

 “On the morning of March 24th at approximately 7:00 o’clock that morn
 
 *677
 
 ing I met Mr.- Ray at the office, he was leaving town and we were discussing some other matters not connected with this property or the loan or anything like that- — something he wanted me to do in his absence and in fact we were upstairs in my office; I think he had to get out of town by 7:30 or a quarter ’til 8:00 — I know we were going over several matters quickly and as we finished we got up to go downstairs together, I said Buckley is coming out this morning about the loan matter with Mr. James’ bank and he is going to want a listing on that property and what shall we do with it, and he says, well what do you think and I said, well I want to do whatever you want to do and he said, well I think it will be all right to let him have it for up to 60 days, not over 90 days and I said, well I’ll talk with him and that was the — upon what I predicated my authority.”
 

 Ray testified that he only became cognizant of the contract when Buckley called him. Wills had placed it in the “Farm File.” Ray consistently denied having ever approved such a listing. He refused to pay the commission, because in his opinion there was no corporate liability. As heretofore stated, Ray testified that he never empowered Wills to sign any document for him.
 

 On the question of liability of Woodlawn Development Corporation, we note that at a special meeting of its board of directors,
 
 [5]
 
 the resolution, supra, was adopted, granting to Louis M. Ray the right to sell property of the corporation. This power included the power to list such property for sale with a licensed realtor. It was express and special. LSA-Civil Code, Article 2997.
 

 “Our Code requires express and special power to be given whenever the things to be done are not merely acts of administration.” Gaiennie v. Akin’s Executor, 17 La. 42, 43. See, Sanders v. Ohio Oil Co., 155 La. 740, 99 So. 583; Op.Atty.Gen. 1942-44, p. 774; Gates v. Bell, 3 La.Ann. 62; Standard Oil Co. of N. J. v. Evans, 218 La. 590, 50 So. 2d 203.
 

 In Snell v. Amite Oil Co., 178 La. 176, 151 So. 70, we held that to enable the president of a corporation to bind it, he must be authorized to do so, and that such authority is generally granted by a resolution of the corporation’s board of directors. This ruling would even have a stronger application to a mere employee such as Wills.
 

 Nowhere in the charter and resolutions of Woodlawn Development Corporation do
 
 *679
 
 we find any delegation of power to Earl J, Wills by the corporation.
 

 Plaintiff is a licensed realtor, who has ■carried on a real estate agency and real estate brokerage business in Monroe, Louisiana, and Ouachita Parish for a number of years. He testified that he had handled more than one thousand transactions, but that he did not know what a corporation was, what it was for, or who could act for it. He stated that he relied upon the advice of his attorney, but that in this particular instance he had not consulted his attorney as to the legality of the exclusive listing secured from Wills.
 

 Buckley cannot be excused for his alleged ignorance, since the attendant facts and circumstances show that he was aware ■of the fact that Wills required express and special authority to execute the listing on behalf of the corporation. As shown from his .testimony hereinafter quoted, Buckley inquired of Wills if he had the authority to sign the contract; that Wills informed him, “Yes,” and he then had Wills sign the agreement to list the property. Buckley made no inquiry in order to ascertain the nature and extent of the powers of Wills and acted at his risk.
 

 “ * * * A person dealing with a corporation is chargeable with notice of limitations and restrictions imposed by statute, is generally bound to know whether or not the person who assumes to represent the corporation and to act in its name is authorized to do so, and therefore cannot hold the corporation responsible for the agent’s unauthorized contract. 19 C.J.S. Corporations § 997. See Peirce v. New Orleans Bldg. Co., 9 La. 397, 29 Am.Dec. 448; Jeanerette Rice & Milling Co. v. Durocher, 123 La. 160, 48 So. 780; T. P. Ranch Co. v. Gueydan & Riley, 148 La. 455, 87 So. 234; Rome v. New River Lodge No. 402, F.
 
 & A.
 
 M., La. App., 197 So. 174.” Jones v. Shreveport Lodge No. 122, 221 La. 968, 60 So.2d 889, 891.
 

 “Whoever deals with an agent is put on his guard by the very fact and
 
 does so at his risk. It is his right and duty to inquire into
 
 and ascertain the nature and extent of the powers of the agent and to determine whether the act or contract about to be consummated comes within the province of the agency and will or not bind the principal.” (Italics ours.)
 

 “If the power exhibited is sufficient, the principal will not be permitted to gainsay the acts of his representative, but if it is not, he is warranted in repudiating them.” Chaffe v. Stubbs, 37 La.Ann. 656; See, Natchitoches Motor Co., Inc., v. Campbell, 17 La.App. 425, 136 So. 133.
 

 Woodlawn Development Corporation specifically denied the authority of
 
 *681
 
 ■Wills to execute the Exclusive Listing 'Contract on its behalf, and the record is ■devoid of any proof of ratification by the ¡corporation. The burden then fell upon Buckley and Wills to prove such authority, which they failed to do.
 

 “Where the names of one of the parties to a contract has been signed by a person representing himself to the other as their agent, and the parties whose names have been thus signed ■specially deny the authority in a suit to enforce it, the burden of showing authority in the agent to sign the names of the principals, or a subsequent ratification by them falls on the party who seeks to enforce the contract.” McCarty v. Straus and Baer & Straus, 21 La.Ann. 592 (Syllabus correctly stating the ruling of the case). Also see, Natchitoches Motor Co., Inc. v. Campbell, supra.
 

 We conclude that the trial judge was correct in holding that—
 

 “The Court in the present case is convinced that Buckley knew that L. M. Ray was the only one that had legal authority to s'ign the listing contract. This is evidenced by the fact that Buckley had negotiated with only L. M. Ray prior to March 24, 1954. Therefore, the Court is of the opinion that the defendant, Woodlawn Development Corporation is not liable to Buckley for the commission.”
 

 We now pass to the personal liability of Earl J. Wills. The trial court held him personally liable, under the authority of the case of Vordenbaumen v. Gray, La.App., 189 So. 342, and Article 3013
 
 [6]
 
 of the LSA-Civil Code.
 

 The case of Vordenbaumen v. Gray, supra, is not apposite. No contract was involved as in the present controversy. There, an heir agreed by letter that he and another would pay a debt of the deceased. The court held that the writer of the letter had personally bound himself, since there had been no promise to pay nor ratification on the part of the other heir.
 

 Article 3013 of the LSA-Civil Code was discussed in the case of A. Lorenze Co. v. Wilbert, 165 La. 247, 115 So. 475, 478, by the then Chief Justice O’Niell, as follows:
 

 “And article 2982 (now 3013) declares :
 

 “ ‘Le mandataire n’est responsible enyers ceux avec qui il a contracté que lorsqu’il s’est oblige personnellement, ou qu’il a excédé les bornes du mandat, sans leur avoir donne connaissance de ses pouvoirs,’
 

 “ — the concluding part of which means, or when he has exceeded the
 
 *683
 
 bounds of the mandate, without having given them knowledge of his powers. The expression in the corresponding article (3013) of the Revised Civil Code, ‘without having exhibited his powers,’ is therefore not a literal or an accurate translation of that part of article 2982 of the Code of 1825, ‘sans leur avoir donne connaissance de ses pouvoirs,’ meaning, ‘without having given them knowledge of his powers.’
 

 “It is well settled that one who contracts as the agent for another is not bound personally if it develops that he exceeded his authority or acted without legal authority, unless the other party to the contract was misled or deceived. If he was fully informed of the facts, by virtue of which the party acting as agent for another claimed authority to represent the other party, the party acting as agent is not bound personally if he exceeds his authority or if it develops that the supposed authority was invalid. In Trastour v. Fallon et al., 12 La.Ann. 25, the plaintiff sought to hold the defendants liable personally for having contracted as the agents of a so-called Permanent Committee, but without legal authority, but the court rejected the demand, saying:
 

 “ ‘The burden of proof, as to the terms of the contract, is upon the plaintiff. To hold the defendants liable, he must show that he contracted with them personally, or that they misled him by assuming to act for others without sufficient authority.’ ”
 

 Also see, Barry v. Pike, 21 La.Ann. 221; Brashears v. Milner, La.App., 64 So.2d 519.
 

 We cannot find any evidence in the record which shows that Wills bound himself personally; nor can we find that he misled or deceived Buckley. Buckley was in Ray’s office the day previous to the execution of the contract herein involved, and with respect to that meeting he testified as follows:
 

 “Q. Did you discuss with Mr. Ray at that time the handling of what we will call the Harman Farm which is the property involved in this litigation— handling it as agent for sale ? A. Yes, sir; I went out — the bank called me to go out there on some other business for Mr. Ray and while I was there — after we came back to the office I asked Mr. Ray did he still have the Harman-Johnson farm, he said yes; I said well do you want to sell it; he said yes, I sure would. He said you know I cut most of it up in lots and since the airport did not come here, he says I believe I’ll just sell it and I said well, what about letting me handle it, he said o.k. I said well let me go out to my car and get a listing blank, he says well, says now my word is my bond, said if anybody sells it — it don’t
 
 *685
 
 make any difference who sells it, you sell it or anybody else, he said you go ahead and advertise it and he said you will get your full 5% commission; so he gave me — on that occasion he gave me these maps which he showed me— went over it with me — went over it with me and showed me where the lots were where I could show it to the different ones that I had, also he gave me a map of the whole — the whole piece of property in that meeting.”
 

 Buckley also testified that Wills was present during the entire meeting with Ray.
 

 With respect to his conversation with Wills on March 24, 1954, Buckley testified:
 

 “Well several days later I had to go back down there to give them a report on the loan which the bank was implicated in and while I was there — before I left I just made the remark to Wills, I said Wills I believe I will just leave a listing here and get Mr. Ray to sign when he comes back in and he — he just made the remark, he said is that still worrying you, I said yes it is; I said I would just like to have a listing, I said — so he said well, he said I’ll sign it and it was still — my listing was out in the car and I said well,
 
 have you got the authority to sign it; he said yes and I said well if you have got the authority to sign it why it is all right and
 
 I went on out and got it and he sat down 'and got the maps and fixed it out and signed it and I went on about my business.” (Italics ours.)
 

 Buckley asked Wills if he had authority, and he testified that Wills said, “Yes.” We
 
 repeat
 
 — since
 
 Buckley made no inquiry in order to ascertain the nature and extent of the powers of Wills, he acted at his risk in accepting Wills’ answer as correct.
 
 See, Chaffe v. Stubbs, supra, and Natchitoches Motor Co., Inc., v. Campbell, supra. Because of his connections with the bank and his negotiations with Ray, Buckley was cognizant of Ray’s title and position. The true situation had been communicated to him the day previous by Ray, and Buckley knew, or should have known, that under the conditions Ray was the only one who could contract with him. We are, therefore, of the opinion that Buckley is barred from recovering from Wills.
 

 For the reasons assigned, the judgment of the trial court rejecting plaintiff’s demand against the defendant, Woodlawn Development Corporation, is affirmed.
 

 The judgment of the trial court in favor of plaintiff and against the defendant, Earl J. Wills, in the sum of $3,250, together with interest and costs, is reversed and set aside.
 

 The judgment of the trial court rejecting the demand of the defendant, Earl J. Wills, against his co-defendant, Woodlawn Development Corporation, is affirmed.
 

 All costs are to be paid by plaintiff.
 

 [1]
 

 . “Exclusive Listing Contract with C. E. Buckley Real Estate Broker “Monroe, Louisiana, March 24, 1954
 

 “Subject to conditions hereinafter set forth:
 

 “For, and in consideration of, services to be performed by the above named agent, I hereby employ said Agent solely and exclusively to sell for me the following described property and Improvements thereon, and appurtenances thereunto belonging, situated in the Parish of Ouachita, State of Louisiana, to-wit: 487.25 (Four Hundred Eighty Seven and Twenty Five One Hundredths) acres, more or less, situated immediately north of the Harman-Joncs Road and immediately east of U. S. Highway No. 165 in Ouachita Parish, Louisiana and presently owned by Woodlawn Development Corp., further being described as a portion of the ‘Bob Harman Plantation’
 

 * * * * *
 

 “I further obligate myself to refer all applicants for the purchase of the above described property to the said Agent. I authorize said Agent to post For Sale signs on the property and to advertise same in any manner deemed necessary to promote the sale of same.
 

 “Upon the sale of the property I agree to pay said Agent a commission of 5 (five) percent, regardless of whether the property is sold by me, by the Agent, or by any other person or persons.
 

 “This contract automatically expires ninety (90) days from date, provided a sale is not pending at the time, and provided further that said Agent shall be entitled to this commission on any sale made by the owner or any other person contacted by the Agent within forty-five days after the expiration of this contract.
 

 “ * * * The price and terms to be as follows;
 

 “indeterminate, it being further agreed and stipulated that agent will offer the above described tract for sale and will furnish vendor with any offers or purchase or agreements to purchase at a stipulated price, and that vendor (Wood-lawn Development Corp.) shall have the right of refusal of any such offers to purchase.
 

 ****![:
 

 “In the event I' do not deliver said property when sold by the Agent I agree to pay the Agent the full commission earned by him through his sale, and all costs and attorney’s fees for enforcing this agreement.
 

 “Woodlawn Development Corp.
 

 “Signed By: Earl J. Wills “Owner”
 

 [2]
 

 . Resolution of April 28, 1953
 

 Passed at a special meeting of the Board of Directors of Woodlawn Development Corporation
 

 “Be It Resolved that L. M. Ray, or Louis M. Ray, one and the same person, President of this corporation be and he is hereby authorized on behalf of said Woodlawn Development Corporation, (the same company as Woodlawn Devel
 
 *669
 
 opment Corporation, Inc., the name having been recently changed so as to drop tiie ‘Inc.’ therefrom), to bargain, sell, transfer, assign, mortgage, pledge, lease, rent, partition, exchange, grant options, or make other transfers of any and all property owned by this corporation, real and personal, wherever situated, upon such terms and conditions and for such considerations, whether for cash or on terms of credit, which he feels to be to the best interest of this corporation. This resolution includes, but not by way of limitation, all real property owned by this corporation in the City of West Monroe and City of Monroe, Louisiana, Ouachita Parish and Franklin Parish, Louisiana, or elsewhere.
 

 “Be It Further Resolved that L. M. Ray or Louis M. Ray be and he is hereby authorized to sign the name of this corporation to any and all papers, deeds, agreements, or other instruments necessary to carry out this resolution, all of his acts in the premises being ratified as the act and deed of this corporation.”
 

 [3]
 

 . Articles of Incorporation of Woodlawn Development Corporation, Inc.
 

 Purposes (Article II) “1. (a) To make, enter into, perform, and carry out contracts for building, erecting, improving, constructing, altering, repairing, decorating, finishing and furnishing houses, buildings, warehouses, storerooms, edifices, works, tenements, and structures of every kind and description; to carry on in all their respective branches the business of builders, contractors, decorators, and such other trades and businesses as pertain to or are connected with the general business of building and construction.
 

 * * * * *
 

 “3. To take, lease, purchase, or otherwise acquire, and to own, use, hold, sell, convey, exchange, lease, mortgage, work, improve, develop, cultivate and otherwise handle, deal in and dispose of real estate, real property and any interest or rights therein, and particularly to lease, sublease, and develop said real estate for oil, gas and other minerals.
 

 * * * * *
 

 “6. To generally conduct and engage in any and all kinds of lawful business authorized under Act No. 250 of 1928 [LSA-R.S. 12:1 et seq.], and amendments thereto, and to do and perform all things necessary or proper to carry out 1he said objects and purposes.”
 

 [4]
 

 . “Q. Did Mr. Wills, Mr. Ray ever at any time have any authority to sign this listing for Woodlawn Development Corporation? A. No, sir; he or no one else.
 

 “Q. Did he ever have any authority from you to sign — you as an officer of Woodlawn Development Corporation? A. No, definitely not and I had specifically refused just prior to the date of that listing in the presence of he and Mr. Buckley.”
 

 [5]
 

 . Article VII of the Articles of Incorporation provides that all corporate powers shall be vested in and all business shall be transacted by the Board of Directors.
 

 [6]
 

 . “The mandatary is responsible to those has bound himself personally, or when with whom he contracts, only when he be bas exceeded bis authority without having exhibited his powers.”