466 So.2d 587 (1985)
Emory A. BYRD, Sr. and Richard Landry
v.
COBBS, ALLEN & HALL MORTGAGE COMPANY, INC. and Vernon G. Davis, III.
No. 84-CA-392.
Court of Appeal of Louisiana, Fifth Circuit.
March 11, 1985.
*588 Thomas E. Schafer, III, New Orleans, for plaintiffs-appellants.
Shushan, Meyer, Jackson, McPherson & Herzog, Donald A. Meyer, New Orleans, for Cobbs, Allen & Hall Mortg. Co., Inc., defendant-appellee.
Before CHEHARDY, BOWES and GRISBAUM, JJ.
CHEHARDY, Judge.
Plaintiffs appeal the dismissal of their suit to enforce a mortgage loan commitment for permanent financing of a commercial building. We affirm, for the reasons set forth below.
Emory A. Byrd, Sr. and Richard L. Landry are real estate developers and building contractors who worked together as Century Builders, Inc. in 1974, when the events made the basis of this suit occurred.[*] Cobbs, Allen & Hall Mortgage Company, Inc. is a mortgage banker with home offices in Birmingham, Alabama and a branch office in Metairie, Louisiana. (Cobbs, Allen & Hall is now known as Mortgage Corporation of the South, but for convenience is hereinafter referred to as "CAH.") Vernon G. Davis, III was employed by CAH at the relevant time as a residential loan solicitor.
Plaintiffs proposed to construct a large commercial warehouse in Kenner, Louisiana, and sought permanent mortgage financing for the project. On April 10, 1974 Davis wrote a letter, on CAH letterhead stationery, to Century Builders stating that CAH agreed to provide permanent financing in the amount of $826,000 subject to various terms and conditions. Based on this commitment letter (or a subsequent substitute in the names of Byrd and Landry personally), the National Bank of Commerce in Jefferson Parish (hereinafter referred to as "NBJ") agreed to provide interim financing during construction. Upon completion of construction, the loan from CAH was to be used to retire the NBJ debti.e., it would serve as the permanent "take-out" financing.
Construction proceeded as planned until September 12, 1974. On that date counsel for CAH wrote a letter informing plaintiffs that the company had been unaware of any commitment for such a loan, that Vernon Davis was never authorized to issue mortgage loan commitments and, alternatively, that the terms required by the letter from Davis had never been fulfilled. For these reasons, CAH advised plaintiffs, the commitment was void and CAH would not fund a loan thereunder. As a result of the lack of permanent financing, NBJ later foreclosed under its construction mortgage when the promissory note became due.
Subsequently plaintiffs sued CAH and Davis for breach of contract and damages, claiming they were responsible for plaintiffs' losses. The case was tried on June 1 *589 and 2, 1983, held over and completed on October 25, 1983. The district court rendered judgment on January 23, 1984 dismissing plaintiffs' claim.
In written reasons for judgment, the trial judge stated,
"The Court finds that Vernon Davis did not have the authority to issue the commitment to the plaintiffs.
"The argument that Byrd and Landry relied on Davis' apparent authority to issue commitments does not prevail because of the relationship which had existed between the plaintiffs and Davis. In addition, there was a lack of the usual requirements which accompany a commitment of this size.
"The estoppel argument urged by plaintiffs fails because the defendants sent a denial letter immediately upon receiving notice in September, 1974 of the alleged commitment."
The issue presented on appeal is whether Davis had either actual or apparent authority to issue the loan commitment.

Evidence
We summarize the testimony from the voluminous transcript.
Erwin H. Mangrum, CAH's senior vice president in charge of residential loan production and branch offices in 1974, testified Vernon Davis had been employed as a residential loan solicitor. His duties were to contact real estate agents and builders to encourage them to use CAH to arrange financing on residential property. The paperwork for such loan applications was processed by other personnel in the branch office, with the occasional assistance of the residential loan solicitors. The application packages, when complete, were then sent to the home office in Birmingham for approval and issuance of the funds. No personnel in the branch offices were authorized to approve any loans. Mangrum testified that Davis had been informed when he was hired of the extent and limits of his job responsibilities.
Mangrum stated that all commercial loans were handled by the commercial loan department, which was separate from Mangrum's department, and always were processed through the Birmingham office. In 1973 and early 1974, the New Orleans branch had a commercial loan solicitor, Joe Beeson, who terminated his employment with CAH in early 1974. Beeson was under the supervision of the commercial loan department. Letters of commitment always came from the Birmingham office, never from the branches.
Mangrum testified that in the usual course of his duties he would visit the New Orleans branch every six to eight weeks. During his routine visit on May 1, 1974 Vernon Davis showed him a letter of commitment Davis had issued to Alpha Builders for twenty-five residential loans totalling a maximum of $738,000. Mangrum testified he was upset and very surprised to see this.
He called William Culp, the branch manager, and Wayne Jamison, the other residential loan solicitor, into the office. He advised Culp, Jamison and Davis that Davis was not authorized to issue such a letter and asked them to bring him any similar letters they might have issued. Culp and Jamison denied issuing any letters, while Davis brought him two additional letters, one to a Hiram Fayard and another to a Richard Weixel. Davis told him these were the only letters he had written. Mangrum testified he made clear to them that under no circumstances were any such letters written except from Birmingham.
Mangrum discussed the problem with Culp, who was to look through the office to see if he could find any other loan commitments and to monitor Davis' further activities. Mangrum stated he discussed the situation with the company president when he returned to Birmingham. They concluded that it was a misunderstanding on Davis' part. They took no action to revoke the three commitments Davis had shown them because they were residential loans.
After that, Mangrum testified, he knew of no further commitment letters until early August, 1974, when he learned Davis may have continued issuing commitment *590 letters after the May meeting. The company sent Mangrum to New Orleans to investigate. Davis' employment was terminated on August 16, 1974. At that time Davis signed a statement allegedly setting forth all commitment letters he had written; it listed 13 letters but did not list the commitment to Century Builders/Byrd and Landry.
Mangrum began contacting loan offices in the New Orleans area to determine whether they had received commitment letters signed by Davis. In early September Roy Price, the attorney for NBJ, telephoned him and advised him NBJ had a commitment letter to Century Builders dated April 10, 1974 signed by Davis. At that point the matter was turned over to CAH's attorney, who wrote the letter of September 12, 1974 denying the commitment. Although meetings ensued among CAH representatives, NBJ officers and plaintiffs to negotiate the matter, CAH ultimately refused to reissue a commitment on the project.
Mangrum estimated they learned eventually that Davis had written between 30 and 40 commitment letters. The evidence shows that many of these were written after the May 1, 1974 meeting at which Davis was instructed to discontinue the practice. Further, many of the commitments were for commercial loans.
William Culp, the branch manager, could not be located to testify at trial. Accordingly, his deposition was placed in evidence in lieu of trial testimony. (Plaintiffs' objection to the admission of the deposition will be discussed later in this opinion.) Culp's deposition had been taken in October 1974 in anticipation of litigation. Culp had been terminated from his position with CAH in September 1974. According to Mangrum, Culp had been fired because of discrepancies in certain office procedures relating to another loan commitment with which Davis was involved.
Culp testified he was in charge of the residential mortgage loan production department and servicing activities, but was never in charge of or handled any commercial loans. Commercial loans were handled in the New Orleans office by Joe Beeson. After Beeson left the company in early 1974, Culp said, local applications for commercial loans were referred to Birmingham.
Culp stated he was Davis' immediate supervisor, in charge of approving residential loan applications Davis originated, prior to sending them to the home office. He said Emory Byrd had been in the office on a number of occasions; he thought they might have closed a loan for Century Builders on some property other than the one at issue here, but Culp stated it would have been a residential rather than commercial loan. Culp knew Byrd was Davis' landlord. He said he first was apprised of the Byrd/Landry warehouse project in September 1974 when Roy Price from NBJ called about Davis' April 10, 1974 commitment letter. Culp said he had no knowledge of the letter until then and had never seen the property before.
According to Culp, he first learned that Davis was issuing letters the preceding May, when Mangrum informed him of it. He said Davis was told to cease writing commitments. Culp stated that he was advised the matter would be completely handled by the home office. He took no action to repudiate the letters or to investigate the matter himself. He claimed to be unaware of what action was taken by the home office.
According to Culp, the branch office had authority to make commitments on conventional residential property loans for 90 days subject to approval by the Federal Housing Administration or the Veterans Administration when required. They did not have authority to make appraisals, however. He stated that as far as he knew, Davis did not make appraisals on any property while at CAH.
He stated that files had been opened on some of the commitments listed on Davis' termination statement, but not on all. He found no file on the warehouse project of Century Builders/Byrd and Landry. He could not say why Davis had not opened *591 files on the others. He admitted he was supposed to supervise Davis' work but said he never went through the files in Davis' office prior to Davis' termination.
Vernon Davis testified that prior to his employment by CAH in August 1973 he had been employed by New Orleans Federal Savings and before that by Pringle Mortgage company as a mortgage loan solicitor. He admitted he had never issued any commercial loan commitments while employed at either of those institutions, but said he spent a considerable amount of his time working on commercial applications. When he applied to work at CAH, he was seeking the same position he had at New Orleans Federal, soliciting residential loans. He claimed he could not recall whether he had been advised of the limits of his authority when CAH hired him.
Davis said he first met Byrd and Landry while he was with Pringle Mortgage. They came in to apply for financing on a four-unit apartment building and he handled the application, which the mortgage company denied. He contacted them about three months later relative to a housing development he thought they might be interested in. Subsequently he became better-acquainted with Byrd when he rented a house from Byrd in June 1973.
Shortly thereafter, Davis said, Byrd and Landry invited him to join them in forming a corporation to build some residential duplexes. Davis bought a one-third interest in the corporation for approximately $2,000. They named the corporation L.B.D. Developers, Inc. He stated he later sold his interest in the corporation to Byrd and Landry because he had run short of cash during construction of his home; he also said he had started work for CAH by that time and did not feel a relationship among the three of them was proper. He received $5,000 for his shares in the corporation. The exhibits in the record show this sale took place in November 1973.
Davis had started work for CAH in August 1973. Davis said Byrd and Landry came in to apply for take-out financing for the warehouse project in the latter part of 1973. They asked him if they could get a take-out letter and he told them he could get it for them. Davis said they never asked him if he had the authority to issue it; they just assumed he did. He admitted he held himself out to them as having the authority. He testified he felt he had acquired the authority to issue commitments because of his "experience." He admitted appropriating to himself the titles "mortgage loan representative" and "mortgage loan officer" with which he signed the letters.
Davis admitted he himself performed the appraisal on which the loan commitment amount was based, valuing the property at $1,180,000. He stated he had taken some courses in real estate appraisal but was not certified. He admitted he did not know how to do an appraisal based on comparable area properties; the only approach he knew was a formula approach based on cost presentation by the borrower and projected income. He calculated the loan amount at 80% of the figure thus derived. His answers to questions about his authority to perform such appraisals at CAH were unclear.
According to Davis, the commitment letters were written with the full knowledge of William Culp, the manager. In fact, Davis stated, Culp showed him how to word the letter to Century Builders/Byrd and Landry. Davis said Culp and everyone else in the office knew about the deal because Byrd and Landry were frequently in the office discussing the project. Davis also said that copies of all the commitment letters he wrote were kept in a "tickler" file in the office; further, he said, Culp reviewed his files with him on a weekly basis, informally, and Davis was sure they had discussed the warehouse project.
Davis disputed Mangrum's testimony as to the date of the meeting at which Mangrum learned Davis had been signing commitments. Davis contended the meeting took place in late May or early June. He also asserted that he had disclosed fully to Mangrum all the commitment letters then outstanding. According to him, Mangrum *592 did not tell him he had no authority to issue commitments, but rather that "things were tough" because CAH had just been purchased by a new company [First National Bank of Boston] and therefore he should stop writing commitments.
Davis openly admitted that even after the May 1974 meeting in which Mangrum informed him he had no authority to issue commitments, he continued to write commitment letters. According to him, however, he wrote only one more letter. He admitted the statement he signed on the day he was terminated did not list all outstanding commitments, but he claimed he had not prepared the list and that he told Culp some letters were not shown on it. (We note Culp had testified that Davis prepared the list.)
He denied that he had ever received kickbacks or financial interests in any of the projects involved. He admitted that he was involved in business arrangements or investments with at least two other prospective borrowers to whom he had issued commitment letters. He asserted, however, these did not take place during his employment at CAH.
Emory Byrd testified he had known Vernon Davis since Davis worked for Pringle Mortgage, but had never made any loans through Davis before 1973. According to Byrd, he had made loan applications through Davis at both New Orleans Federal and Pringle, but those deals fell through. He said when he and Davis became better-acquainted in 1973 and learned they were both "trying to put packages together," they began a closer association because they found they "might be of some help to each other." He, Landry and Davis formed the L.B.D. corporation. According to Byrd, Davis withdrew from the corporation because it expanded to the point where they figured Davis might become a "nuisance" as a conflict of interest. It might appear improper, he said. He denied there was any dissension among the three of them.
Byrd said he became interested in developing the warehouse project because he wanted a secure income as he got older. He admitted he had never previously been involved in a single project of that magnitude; his previous construction deals had involved properties valued at no more than $80,000. Byrd stated he had been "wheeling and dealing" at CAH relative to other projects since Davis started work there, before he brought up the warehouse project. He and Landry never discussed with Davis his authority to issue commitments. He said Davis never told them, either at CAH or New Orleans Federal, that he was not authorized to sign commitments.
According to Byrd, he and Landry were frequently at the CAH office discussing the project. They met Bill Culp, Wayne Jamison and Joe Beeson. Various office personnel were often around when they were discussing the warehouse with Davis. Byrd stated the act of sale of the land and signing of the interim loan with FNJ took place on April 30, 1974. He said Davis was present at the act of sale. During construction Davis went by the jobsite from time to time to check its progress. According to Byrd, both Culp and Jamison went by to look at the construction, and Culp complimented him on the building's appearance.
Byrd denied he had any knowledge beforehand that Davis was seeking employment at CAH, or that he had asked Davis' assistance before filing their application at CAH. He also asserted he and Landry had provided CAH with all the documents required by the commitment letter of April 10, 1974, including an appraisal by an independent appraiser.
(In fact, the only appraisal CAH received was for a completely different property owned by Century Builders. The only appraisal of the warehouse project in evidence is an appraisal dated March 12, 1975 made at CAH's request. Various other documents required by both FNJ and the letter by Davis, such as title insurance policy and fire insurance policy, were not proven delivered.)
*593 Richard Landry testified they had consulted Davis at CAH about other projects prior to the warehouse development. He said Davis told him he was in charge of soliciting loans for CAH, but they did not discuss his functions per se. He said he first met Davis when Davis was at New Orleans Federal.
According to Landry, the reason they bought out Davis' interest in the L.B.D. corporation was that he and Davis had a personality conflict. Davis was interfering with the subcontractors on the houses the corporation was building. Landry said the conflict he had with Davis was different from whatever "conflict of interest" Davis and Byrd may have had.
He said Davis told him that a CAH "inhouse" appraiser had performed the appraisal that fixed the value at $1,180,000. Landry admitted he and Byrd did not pay a commitment fee to obtain the commitment letter; rather, he said, they negotiated with Davis to escape that. He said they just paid a processing fee. The commitment letter provided they would pay a fee when the loan was closed, he said. (In fact, review of the letter of April 10, 1974 discloses it provided for no commitment fee, and for an "origination fee" of 1% only in the event the loan was not closed.)
Landry also testified he recalled delivering to the bank some of the documents CAH claimed were never delivered. He was sure they had obtained a commercial appraisal of the warehouse within 90 days of the act of sale, but could not explain why the wrong appraisal had been delivered to CAH.

Actual Authority
The law of agency in Louisiana is governed by the Civil Code articles on mandate, arts. 2985-3034. A mandate may be written or verbal; it may grant indefinite or restricted authority; it may be general for all affairs, or special for one affair only. LSA-C.C. arts. 2992, 2995, 2994. A general mandate confers only a power of administration; to do any act of ownership the power must be express. LSA-C.C. art. 2996. LSA-C.C. art. 2997 specifies the power must be express for such purposes as to sell or to buy, to incumber or hypothecate, to contract a loan or acknowledge a debt and, in general, where the things to be done are not mere administrative acts. See Buckley v. Woodlawn Development Corporation, 233 La. 662, 98 So.2d 92 (1957).
Erwin Mangrum's testimony explaining how CAH handled commercial loans and commercial loan commitments is unrefuted. It is plain that the employees of the New Orleans branch did not have specific authority from their employer to issue commercial loan commitments. Even assuming Davis' testimony is true and he wrote the loan commitments with the knowledge and assistance of his supervisor, Culp, that did not give him actual authority to issue the commitments. Culp could not delegate a power he himself did not have.

Apparent Authority
Lacking the required express power to lend money on behalf of the company and thus the actual authority to issue the commitments, did Vernon Davis have apparent authority?
"[O]ne who is notified that a contract has been made for him by a person who purports to have authority to do so is presumed to have ratified the contract unless he promptly repudiates any such authority when he is informed thereof. * * *"
Builders Center, Inc. v. Smith, 228 So.2d 245, 247 (La.App. 1 Cir.1969).
For a principal to be found to have ratified an act of an agent outside the scope of his authority the facts must indicate a clear and absolute intent to ratify. Pailet v. Guillory, 315 So.2d 893 (La.App. 3 Cir.1975). The principal must, with full knowledge of the facts, express an intent to ratify the unauthorized acts. Pargas, Inc. v. Estate of Taylor, 416 So.2d 1358 (La.App. 3 Cir.1982).
It is clear that CAH repudiated the letter of commitment to plaintiffs promptly upon *594 learning of it, through its attorney's letter of September 12, 1974.
Where the principal has denied the agent's authority and there is no proof the principal has ratified the agent's act, the burden of proving apparent authority is on the person seeking to bind the principal. Buckley v. Woodlawn Development Corporation, supra. See also, Byles Welding & Tractor, Inc. v. McDaniel, 441 So.2d 48 (La.App. 3 Cir.1983); Bamber Contractors v. Morrison Engineering, 385 So.2d 327 (La.App. 1 Cir.1980); Federal Ins. Co. v. C & W Transfer & Storage Co., Inc., 282 So.2d 563 (La.App. 4 Cir.1973); Builders Center, Inc. v. Smith, supra.
"Apparent authority is a principal of estoppel, which operates in favor of third persons seeking to bind a principal to an unauthorized act of an agent. In this context, it is both fair and equitable to govern mutual rights and liabilities by the apparent scope of an agent's authority, because third persons, who are not privy to the actual terms of the agency agreement, must rely entirely upon the indicia of authority with which the agent is vested. * * *"
Broadway v. All-Star Insurance Corporation, 285 So.2d 536, 538 (La.1973).
"Two requirements must be met for the doctrine of apparent authority to apply. First, the principal must make some form of manifestation to an innocent third party. Second, the third party must rely reasonably on the purported authority of the agent as a result of the manifestation. * * *"
Bamber Contractors v. Morrison Engineering, supra, at 330; Lilliedahl & Mitchell v. Avoyelles Trust & Sav., 352 So.2d 781 (La.App. 3 Cir.1977).
A person who deals with a corporation is chargeable with notice of the limitations and restrictions placed on it by statute and is generally bound to know whether or not a person who presumes to represent the corporation and acts in its name is authorized to do so. Buckley v. Woodlawn Development Corporation, supra.
"Our jurisprudence holds additionally that the person dealing with an agent is put on his guard by the fact of the person's alleged agency alone and deals with him at his own risk. It is his duty to inquire into and ascertain the nature and extent of his powers as an agent and determine whether or not the act or contract about to be consummated comes within the province of his agency and will or will not bind his principal. * *"
Carey Hodges Assoc., Inc. v. Continental Fid. Corp., 264 So.2d 734, 736 (La.App. 1 Cir.1972). See also, Buckley v. Woodlawn Development Corporation, supra; North American Sales A., Inc. v. Carrtone Lab., Inc., 214 So.2d 167 (La.App. 4 Cir.1968); Builders Center, Inc. v. Smith, supra.
The reasonableness of a third party's reliance on the purported authority of an agent is determined from all the facts and circumstances of the case. Lilliedahl & Mitchel v. Avoyelles Trust & Sav., supra. See also, AAA Tire & Export, Inc. v. Big Chief Truck, 385 So.2d 426 (La.App. 1 Cir.1980). The trial court's conclusion on this point is a factual determination which must be shown to be clearly wrong to be reversed. See Manuel Truck & Equip. Co. v. B.G. Hooker Pet., 430 So.2d 1367 (La.App. 3 Cir.1983); Pailet v. Guillory, supra.
Thus, the crucial factors with respect to Byrd and Landry are whether they were innocent third parties and whether they reasonably relied on Davis' assumption of authority to issue the commitment.
The trial judge stated that plaintiffs' contention they relied on Davis' apparent authority "does not prevail because of the relationship which had existed between the plaintiffs and Davis."
We conclude the judge believed, in effect, that plaintiffs were unreasonable in their reliance. Viewing the evidence as a whole, we cannot find him to be clearly wrong on this point. Plaintiffs failed to carry their burden of proof by a preponderance of the evidence. We cannot say the *595 evidence establishes conscious fraud, as to plaintiffs; certainly, however, the history of their dealings with Vernon Davis raises suspicion sufficient to establish they were not "innocent third parties."
Plaintiffs argue they relied on Davis' authority because his actions were performed with the knowledge and approval of Culp, the branch manager. There was, obviously, direct contradiction on this question between Culp's testimony and the testimony of Davis and the plaintiffs. We cannot consider this sufficient to place vicarious liability for Culp's and Davis' actions on CAH. The crux of the case is that Byrd and Landry, under these circumstances, were not innocent third parties.
As we mentioned earlier, plaintiffs object to the admission of Culp's deposition in lieu of his testimony. Plaintiffs argue CAH failed to establish with sufficient certainty that Culp could not be located within 100 miles of the court, as required by LSA-C.C. art. 1450. The trial judge apparently felt the testimony of Kathlyn Nolan, a CAH employee, sufficiently established adequate efforts to locate Culp. We find no abuse of his discretion in that ruling. Further, any presumption arising from Culp's failure to testify would have to weigh equally against plaintiffs as against CAH because it was plaintiff's burden to prove the apparent authority they assert arose from Culp's actions.
Considering our conclusion on the question of authority, we find it unnecessary to consider the alternative questions of whether the letter of commitment contained the customary requirements for such a contract and whether the plaintiffs complied with its terms and conditions relative to documentation.
For the foregoing reasons, therefore, the judgment of the district court is affirmed. Plaintiffs-appellants are assessed the costs of this appeal.
AFFIRMED.
NOTES
[*] Emory A. Byrd, Sr. was discharged in bankruptcy on January 27, 1976 and Dorothy Cowen, as receiver for the bankrupt, has succeeded to his interest in this suit. Richard Landry's interest in the suit has been seized by the National Bank of Commerce in Jefferson Parish in satisfaction of a deficiency judgment. For convenience, however, we shall continue to refer to Byrd and Landry as "plaintiffs."