531 So.2d 524 (1988)
PELICAN HOMESTEAD & SAVINGS ASSOCIATION
v.
AIRPORT MINI-WAREHOUSES, INC. A/K/A Airport Mini Storage, Clancy Dupepe, Archie R. Usher and Darryl S. Williamson.
No. 88-CA-210.
Court of Appeal of Louisiana, Fifth Circuit.
August 29, 1988.
William E. Wright, Jr., Baldwin & Haspel, New Orleans, for plaintiff-appellee.
Winthrop C. Gardner, New Orleans, for defendants-appellants.
Before KLIEBERT and WICKER, JJ., and LOUMIET, J. Pro Tem.
WICKER, Judge.
Pelican Homestead and Savings Association, the holder of a first mortgage and promissory note, sued the makers, Airport Mini-Warehouse, Inc., a/k/a Airport Mini-Storage, Inc.; F. Clancy Dupepe; Archie R. Usher; and Darryl S. Williamson (AMW). AMW appeals the judgment rendered against it, and we affirm.
Dupepe, Usher and Williamson are the principals of the corporate defendant. These parties sought interim and permanent financing from Pelican for the construction *525 of a storage project on land owned by Usher and Williamson in St. Charles and Jefferson Parishes. According to AMW, a certain portion of this property, which was included in the legal description furnished to Pelican, was to be reserved for commercial usage. It was not to form part of the immovable collateral for the financing.
Pelican issued a commitment letter describing the loan and its collateral as:
A first collateral mortgage and collateral chattel mortgage of FIVE MILLION AND NO-100 ($5,000,000.00) DOLLARS, on property described on Exhibit "A" annexed hereto, (designated as the mini-warehouse site and parking lot site), covering the Project and all furnishings, fixtures, and equipment to be located therein: ...
Exhibit "A" was not attached to the commitment letter.
AMW claims it intended to resubdivide the property in question so that the reserved commercial property could be excluded from the operation of the mortgage but, pending parish approval of the resubdivision, delayed this procedure until after the closing of the interim financing. Allegedly, a representative of Pelican assured AMW that the commercial property would be later released from the operation of the mortgage as soon as the resubdivision was accomplished. When the resubdivision was complete, AMW contacted Pelican about having this portion of the property released from the mortgage, intending to lease, sell, or borrow against this property separately in order to obtain cash for the storage project. The project was under-capitalized and now in financial difficulty.
Pelican agreed to submit the matter of release to its board, provided a new appraisal of the property was made. This appraisal matched the earlier one made in connection with the closing and excluded the commercial property at issue. AMW obtained a second mortgage from another lender for working capital when Pelican did not release the commercial property from its mortgage.
The parties then undertook to arrange permanent financing for the project. Pelican refused to provide that financing unless the commercial property was included in the collateral. Since without that permanent financing Pelican would be in a position to foreclose on the mortgage and sue the individuals on their personal guarantees, all parties agreed to execute the necessary papers to obtain the financing, including a mortgage against the disputed property.
Pelican's counsel prepared the documents, including the corporate resolution for AMW. An inconsistency in the papers authorized Dupepe, as president, to enter into this transaction; however, the actual loan documents called for execution by Usher, the secretary.
AMW's financial condition worsened, and its note to Pelican was increasingly in arrears. Pelican finally agreed to consider releasing the commercial property, conditioned upon provision of an $80,000.00 escrow to secure the debt, an accounting of the cash flow, payment of the arrearages, and a new appraisal. This third appraisal was unfortunately lower than the others, and Pelican refused to release the commercial property.
New arrearages accrued, and Pelican demanded payment. It followed that demand with a suit on the note, a prayer for recognition of its mortgage and for appointment of a keeper, and a request for a writ of sequestration. The project was seized pursuant to the requested writ. AMW sued for damages and for specific performance of Pelican's alleged agreement to release the commercial property. The three-day trial resulted in judgment in favor of Pelican against the individual and corporate defendants in the amount of the arrearages plus costs and attorney's fees. The judgment also ordered that the property be seized and sold to satisfy Pelican's mortgage.[1] *526 AMW argues that the trial judge made several errors: in refusing to grant specific performance of Pelican's alleged agreement to release the mortgage on the commercial property, in requiring "clear and convincing" evidence of AMW's claim for release of the property, in finding that AMW's attempts to obtain a release of this property were attempts at "reformation" of the mortgage, in finding the note and mortgage valid, and in failing to find that payment of AMW's arrearages was not a "novation" requiring the release of the commercial property.
WAS THERE AN AGREEMENT BETWEEN PELICAN AND AMW TO RELEASE THE "COMMERCIAL PROPERTY" FROM THE MORTGAGE?
AMW claims that it was the intention of all parties to the negotiations, the loan commitment, and the actual note and mortgage that the commercial property be excluded as collateral. Pelican's position is that there was insufficient if any proof of such an understanding. The trial judge found
If the agreement between the parties was to exclude certain property the intention could have been validly stated in the interim mortgage without the necessity of a formal resubdivision by the insertion of the words "less and except commercial property."
Pelican established a prima facie case in support of its suit. It introduced the authentic acts constituting the promissory note and mortgage. It elicited the testimony of AMW's three principals; and each principal identified the promissory note and mortgage, verified the signatures thereon, confirmed the receipt of the loan proceeds, and admitted that no payments on the indebtedness had been made from April of 1986 until suit was filed in October. The burden of proving a modification in this obligation or other special defenses then shifted to AMW. La.C.C. art. 1831; Travitzky v. Fitzgerald, 218 La. 328, 49 So.2d 417 (La.1950).
Acts of mortgage are required to be in writing. La.C.C. art. 3305. The case of Mathieu v. Nettles, 383 So.2d 1337, 1340 (La.App.3rd Cir.1980) writ den. 390 So.2d 202 (La.1980), treats at length the question of the effect of written contracts, authentic acts, and acts of sale.
Parol evidence cannot be admitted against or beyond what is contained in a written contract, and is inadmissible to vary, alter or add to the contract terms. LSA-C.C Article 2276 [now art. 1848].... We are aware that although parol evidence cannot be introduced to vary the terms of a written act of sale, when an ambiguity exists in the act, resort to extrinsic evidence is permissible to clarify the ambiguity by showing the intention of the parties.... The credit sale deed is clear and unambiguous. Parol or extrinsic evidence should not, therefore, have been admitted.
Additionally, an authentic act is full proof of the agreement contained in it, against the contracting parties, their heirs or assigns, unless forgery is alleged and proved. LSA-C.C. Article 2236 [now art. 1835]. Recorded deeds of conveyance speak for themselves, and subsequent parol evidence cannot be admitted to modify their terms unless fraud or error is alleged.... The above quoted rule applied to all authentic acts.... (Case citations omitted.)
Nevertheless, under the terms of La.C.C. art. 1848, parol evidence can be used "to prove that the written act was modified by a subsequent and valid oral agreement." AMW is not alleging a subsequent modificationit is alleging that the written documents were subject to a pre-existing agreement by Pelican to release the commercial property from the mortgage as soon as resubdivision could be accomplished. We do not find in the record sufficient evidence of this contention.
The community property settlement agreement clearly indicated the property included within the partition. Its provisions are clear and unambiguous. The agreement is in authentic form, having been executed before a notary public and two witnesses in conformity with La.C.C. art. 2234 [now art. 1833]. Therefore, under La.C.C. art. 2236 [now art. 1835], *527 the document is full proof of the agreement between the contracting parties. The agreement is clear and unambiguous as to the property included; since there have been no allegations that the contract was a forgery, the trial court was free from error.... (Footnotes omitted.)
Rayner v. Butler, 482 So.2d 965, 966 (La. App.3rd Cir.1986).
Further, even if there were sufficient evidence, antecedent verbal agreements which are in conflict with a written agreement cannot be proved by parol evidence. Parlay Enterprises, Inc. v. R-B-Co., Inc. of Bossier, 504 So.2d 660 (La. App.2d 1987) writ den. 508 So.2d 819 (La. 1987); Mott v. Phillips, 372 So.2d 223 (La. App.3rd Cir.1979).
Since we hold that there was insufficient proof of an agreement between the parties to release the commercial property from the effects of the mortgage, we must necessarily hold that AMW was not entitled to specific performance of such an agreement.
WERE THE PROMISSORY NOTE AND MORTGAGE INVALID FOR LACK OF CORPORATE FORMALITIES?
AMW claims that the resolution authorizing it to enter into this financial transaction, which was prepared by Pelican, was ineffective, since the authority was given to Dupepe but Usher actually signed the documents. Pelican asserted at trial that this is of no moment because the last-minute substitution of Usher's name on the note and mortgage was made because Dupepe was running late, all three principals were present when the documents were signed, and AMW and its principals ratified the agreement. The trial judge found tacit ratification under La.C.C. art. 1843.
All three principals of AMS [AMW] were aware that Usher signed the documents on behalf of the corporation and acquiesced in his doing so. All three signed the note in a personal capacity. Defendants accepted all the benefits of obtaining permanent financing of the loan and indicated they assumed the obligations on the note. Their argument that no benefits were derived because no new money was funded was not persuasive.
We believe the evidence before the court was sufficient to support a finding of ratification.
The law is well settled that a course of conduct pursued by a corporation in permitting an officer to do an act is an acquiescence in such act and creates an estoppel.... And a corporation may ratify the acts of its officers even though the act was without the authority of a formal resolution of its Board of Directors....
A corporation may not reap benefits and repudiate obligations arising from officer's acts on the ground that there was no resolution of the board authorizing such acts.... (Citations omitted.)
Russ v. United Farm Equipment Co., 230 La. 889, 89 So.2d 380, 382 (1956). Accord: Byrd v. Cobbs, Allen & Hall Mortg. Co., Inc., 466 So.2d 587 (La.App. 5th Cir.1985).
WAS THERE A SUBSEQUENT AGREEMENT TO RELEASE THE COMMERCIAL PROPERTY?
AMW also claims the parties entered into an agreement subsequent to the promissory note and mortgage which obligated Pelican to release the commercial property. In April of 1986, the payments were four months in arrears. According to AMW, Pelican agreed to release the property when AMW paid the arrearages. AMW paid $42,949.32, bringing the loan current; and it alleges that Pelican reneged on its promise to release the property. Pelican, on the other hand, claims to have given only conditional approval of such a transaction. Release of the property depended upon board approval and a satisfactory appraisal. The trial judge found that "Defendants failed to prove the payment to bring the loan current was given in consideration of a release of the `commercial property.'"
AMW and its principals had the burden of proving the alleged agreement. The three individuals testified, but that testimony was rebutted by Pelican's witnesses. Given the trial judge's better position to *528 evaluate credibility, we cannot see that she has erred in her conclusions.
DID PELICAN SUBJECT AMW TO DURESS IN THESE TRANSACTIONS?
AMW claims that at the time of the interim financing and at the time of the permanent financing, it acted under economic duress imposed by Pelican.
One act of duress allegedly consisted of an insistence on the part of Pelican that the interim financing loan be closed prior to December 31, 1984, which allegedly resulted in AMW's having to rush through a closing without having had the opportunity to resubdivide the commercial property. However, the record shows that negotiations with Pelican began in August of 1984, AMW didn't act to resubdivide until August of 1985, and the resubdivision took only a few days to accomplish. We cannot see that AMW's failure to subdivide earlier is attributable to Pelican or that Pelican acted improperly in this regard.
The other act of alleged duress occurred when Pelican insisted that permanent financing be contracted for in December of 1985, on pain of having the interim loan foreclosed and principals' personal guarantees called. Again, we cannot see an imposition of duress in these actions of Pelican. AMW called an expert on banking practices to testify on its behalf; and nothing in his testimony supports the conclusion that Pelican was guilty of any bad faith in its dealing with AMW and its principals.
CONCLUSION
"... [R]eviewing court[s] must give great weight to the conclusions of the trier of fact, and should not disturb reasonable evaluations of credibility and reasonable inferences of fact, even though other evaluations and inferences are as reasonable." Aleman v. Lionel F. Favret Co., Inc., 349 So.2d 262, 264 (La.1977). We find the trial judge's conclusions reasonable ones, and we decline to reverse the judgment. Airport Mini-Warehouses, Inc., a/k/a Airport Mini-Storage, Inc.; F. Clancy Dupepe; Archie R. Usher; and Darryl S. Williamson must pay the costs of this appeal.
AFFIRMED.
NOTES
[1] A later trial of the amount of arrearages resulted in a money judgment against AMW which has not been appealed.