335 So.2d 37 (1976)
William H. REBMAN and Gertrude Gardner, Inc.
v.
C. Espy REED.
No. 6945.
Court of Appeal of Louisiana, Fourth Circuit.
June 9, 1976.
Concurring Opinion On Denial of Rehearing July 29, 1976.
Writ Refused October 27, 1976.
*39 Polack, Rosenberg & Rittenberg, Leon H. Rittenberg, Jr., New Orleans, for plaintiffs-appellants.
Hammett, Leake & Hammett, Robert E. Leake, Jr., New Orleans, for defendant-appellee.
Before LEMMON, GULOTTA and BEER, JJ.
LEMMON, Judge.
In this suit for damages based on the alleged breach of a written contract to sell immovable property, the principal issue is whether a contract was struck which was binding on the seller. On September 20, 1970 William Rebman, the prospective purchaser, signed a standard form offer to purchase the property, and on September 21 Mrs. Gertrude Gardner, a real estate broker, accepted as agent for C. Espy Reed, the owner. When Reed repudiated the agent's acceptance, Rebman and Mrs. Gardner's corporation filed this suit, seeking damages in the amount of the deposit and of the commission respectively. The trial court found, after a trial on the merits, that Reed had ratified Mrs. Gardner's acceptance of Rebman's offer and awarded contractual damages. We reverse.

I
A contract to sell immovable property, to be enforceable, must be in writing and must be signed by the buyer and the seller, and if an agent executes the contract on behalf of the buyer or the seller, the agent's authority must be express and in writing. C.C. art. 2275, 2776, 2992, 2997; Turner v. Snype, 162 La. 117, 110 So. 109 (1926); Krupp v. Nelson, 50 So.2d 464 (La.App.Orl.1951). In the present case it is undisputed that at the time Mrs. Gardner executed the acceptance, she had no written authority to do so. Therefore, plaintiffs in order to prevail had to prove Reed ratified Mrs. Gardner's acceptance on his behalf.[1]
In reviewing the record, we accord no weight whatsoever to the testimony of Mr. and Mrs. Reed, which was completely rejected by the trial judge. We conclude, nevertheless, that plaintiffs failed to bear the burden of proving ratification of the September 20 offer as written.

II
When Reed employed the Gardner agency to sell the home, he signed a listing agreement which set the price and terms at $129,000.00 cash, including all draperies and some listed appliances.[2] Reed's wife, *40 a salesperson with the Gardner agency, was the listing agent named in the agreement.
Margaret Gossett, another Gardner salesperson, obtained from Rebman the written offer upon which this suit is based. The offer, for $100,000.00, including the stove and "all items attached to wall", contained the following provision:

Mrs. Gossett related the following version of the pertinent events leading up to the offer and acceptance: On Saturday, September 19, the day before the written offer at issue, while the Reeds were temporarily in Florida, she telephoned Mrs. Reed and submitted for overnight consideration an offer of $100,000.00, including the draperies and appliances. She read the complete offer to Mrs. Reed, who filled in the terms on a blank standard form she had brought to Florida with her. The next day Mrs. Reed called back and submitted two counter offers, one for $103,000.00 with the draperies and other items and the other for $100,000.00 without these items. They then discussed at length the provision in the offer making the sale conditional upon Rebman's obtaining homestead financing. When Mrs. Gossett insisted that most offers contain this condition, Mr. Reed took the telephone and stated that regardless of how the majority of offers were worded, when he bought property he first arranged financing and then put in a cash offer. When she asked for ten days to help Rebman obtain financing, Reed gave her until Tuesday night. She then contacted Rebman, who signed the offer at issue (containing the already rejected financing condition) and authorized her to apply for financing to the homestead which held the mortgage on his present home. The next morning (Monday) she and Mrs. Gardner secured a loan commitment, which was expressly subject to the title and survey being acceptable to the homestead's attorney. (The homestead president testified he discussed with Mrs. Gossett and Mrs. Gardner that the loan was also subject to certain appraisal standards, as were all homestead loans.) Later that day (September 21) she telephoned Mrs. Reed in Florida and told her that arrangements had been made for the financing (according to the Reeds' version, she said that the deal was the way they wanted it). Reed then authorized Mrs. Gardner to accept that offer for him.[3] Mrs. Gardner requested written confirmation, but immediately (on September 21 at 3:55 p.m.) executed the acceptance of the September 20 offer "as agent for Seller as per Telephone authorization."[4]
*41 Also undisputed are the following facts: On Tuesday, September 22 Mrs. Gardner again telephoned Reed, reaffirmed the previous day's conversation, and again requested written confirmation of authority. Reed then wrote and mailed to Mrs. Gardner the following:
 "September 22, 1970
"I authorize you to accept the offer on my house at 1224 Second Street, New Orleans, La., in the amount of $100,000.00 all cash to me. No draperies, rugs, washing machine or dryer to be included in the Sale."
The Reeds returned to New Orleans on Friday, September 25, and after spending the weekend looking at apartments and houses, submitted an offer on September 29 on a house in Metairie, which was rejected. Later on September 29 Mrs. Reed notified Mrs. Gardner that they rejected Rebman's offer because of the financing condition.[5]

III
Plaintiffs' only evidence on ratification after Mrs. Gardner's acceptance was Reed's September 22 letter. We find that letter insufficient.
At the time Mrs. Gardner accepted the offer on Reed's behalf the contract was voidable, but Reed had the power to validate the contract. Validation or ratification will not be presumed, however, and the party seeking to enforce the contract must prove that the other party ratified the agreement with full knowledge of all of the facts.
The September 22 letter authorizing acceptance of "the offer . . . in the amount of $100,000 all cash" (emphasis supplied) merely constitutes written confirmation of the earlier verbal acceptance and thus needs explanatory evidence. Mrs. Gossett's own testimony makes it clear that the only dispute over the verbal acceptance centered around the financing condition. She stated that her discussion with Mrs. Reed as to whether or not the offer she had read over the telephone constituted an "all cash offer" precipitated Mr. Reed's taking the telephone and telling her that he always made his own financing arrangements before putting in a "cash offer".
It is in the light of Mrs. Gossett's testimony that we must view Reed's September 22 letter and determine whether that letter made the previously voidable contract enforceable.
Nowhere in her testimony does Mrs. Gossett state that Reed accepted the September 20 offer (written before the commitment) on the condition that Rebman *42 obtain financing in two days.[6] (If so, the offer could have been accepted the same day by merely changing the "21 days" on line 13 to "2 days"). Indeed, without even mentioning the 21-day provision, she testified that he rejected the offer as then written.[7] Significantly, this suit is based on the alleged ratification of the very same rejected offer, except that a qualified financing commitment had been obtained from a third party.[8] Since the letter does not expressly confirm acceptance of the previously rejected term of the contract, it cannot provide conclusive proof that Reed accepted the previously rejected offer because a qualified commitment had been obtained.
The very purpose of the writing requirement for contracts to sell immovable property is to prevent misunderstandings over verbal terms. Mrs. Gossett could have mailed Rebman's offer to the Reeds.[9] She chose instead to take the chance that both parties would form the same impression from spoken words. The agency cannot now claim a commission on a sale which was aborted because a misunderstanding occurred over the verbal terms, when the Code and the jurisprudence require the terms of an offer to sell immovable property to be express and in writing. Since there was a reasonable misunderstanding over the only contractual term in dispute, we conclude the contract was not validated by ratification, and therefore no contractual damages and penalties are due.
Accordingly, the judgment of the trial court is reversed, and it is now ordered that judgment be rendered dismissing plaintiffs' suit. The costs in both courts are to be evenly divided.

REVERSED AND RENDERED.
GULOTTA, J., concurs in the result.
BEER, J., concurs and assigns reasons.
GULOTTA, Judge (concurring).
I concur with the result.
BEER, Judge (concurring).
I concur in the result, being in accord with the majority's view that enforceable contracts for the sale of real estate must be in writing and, also, in accord with the majority's view that the record does not support compelling proof of ratification.
However, I am convinced that Mr. Reed's bombastic, delayed reaction to the financing provisions of the purchase offer *43 was contrived and self-serving. In my view, the Reeds wanted out of the selling agreement not because of the innocuous financing provisions contained therein (which obviously created no serious problem with respect to the transaction) but purely and simply because they had, by the time of their "discovery," determined that they would not be able to buy the house on Mulberry Drive at their price. Failure to put the whole deal together resulted in an emotional chain reaction which precipitated their last-ditch scheme to upset the sale to Rebman. Reed's contention that he was sufficiently outraged upon his discovery of the financing provisions of the agreement (which came several days after his initial O.K.) to precipitate his reneging on the deal is ludicrous. I reject it totally.
Nevertheless, I believe that the critical, telephone-transmitted representations regarding the financing arrangements were inaccurate. Although I am convinced that Reed would have been indifferent to this if he had gotten the Mulberry Drive property at his price, I still feel obliged, under all of the circumstances, to concur in the majority's resolution of the case for the reasons previously stated.
I am thoroughly convinced that Reed is escaping a moral obligation by the contrivance of petulant and bellicose objections which we are obliged to dignify because a less than accurate description of the financing agreement occurred during the telephone conversation between Gardner's office and Reed. This tainted both the acceptance and the ratification.
It is unfortunate in the extreme that Rebman, the only unerring party, must be deprived of relief in the circumstances.
BEER, Judge (concurring in the denial of a rehearing).
Sharing their conviction that to grant same would serve no useful purpose, I agree with my brothers in denying a rehearing.
Even so, I feel obliged to reiterate my observation that plaintiff-appellee, Rebman, is the victim of a contrived, self-serving (though legally sufficient) defense interposed by Reed which is precariously based upon a technically inaccurate (and, thus, legally unsatisfactory) telephone transmitted representation made by Gardner's office.
It is my view Reed's position is the least morally defensible, Gardner's is next (though a long way back from Reed's) and Rebman is blameless. Nevertheless, Rebman's claim must be washed away because of the deficiencies in the critical telephone transmitted representation by Gardner to Reed regarding the financing arrangements.
NOTES
[1] The trial court originally maintained an exception of no cause of action, and this court affirmed. La.App., 274 So.2d 850. The Supreme Court reversed and remanded for trial, on the basis that plaintiffs had alleged the buyer's ratification and should be afforded an opportunity to prove the allegations at trial on the merits. La., 286 So.2d 341.
[2] We emphasize that Gardner's claim for a commission is not based on the listing agreement. That agreement was essentially an offer of employment, in which Reed offered to pay Gardner a stipulated commission for findings a purchaser on the stated terms, and Gardner's power of acceptance could be exercised by performance of the requested service. There is no issue raised in this case as to any commission or quantum meruit award due because of the broker's performance or partial performance under the listing agreement, which apparently expired according to its own terms.

The issues in this case solely involve the September 20 offer to purchase, which contained different terms than those stated in the listing agreement.
[3] Herein lies the heart of the dispute. Reed contends he reasonably understood that he was authorizing acceptance of a new unconditional offer and that Mrs. Gossett had not obtained a new offer with the financing condition removed, but in effect had resubmitted the previously rejected offer, which was conditional upon financing, after obtaining a commitment for financing. Mrs. Gossett on the other hand, contends she reasonably understood Mr. Reed had given her two days to obtain fulfillment of the condition.
[4] All parties concede that at this point the agent's acceptance did not then give rise to an enforceable contract, since the authority for the acceptance was not in writing.
[5] Plaintiffs contend Mrs. Reed became upset when their offer on the Metairie house was rejected, having previously indicated she really didn't want to sell the old house.

The Reeds' explanation of the rejection was: They owned a vacant lot in Metairie on which they intended to construct a new residence, and found a house for sale nearby. On Monday, September 28, Mrs. Reed executed an offer to purchase the Metairie house, and Mrs. Gardner submitted it to the listing broker. The next afternoon (as verified by Mrs. Gossett) Mrs. Reed learned that the offer had been rejected. She also obtained, for the first time, a copy of the Rebman offer (which she did not examine, according to her testimony, because she was long before satisfied that the offer was the way they wanted it and because she was then involved in pursuing the Metairie house). She told Mrs. Gardner she would put in a higher offer the next day on the Metairie house. That evening (September 29) Mr. Reed came home and for the first time read the Rebman offer. When he saw the financing contingency, a condition he had categorically refused to accept despite Mrs. Gossett's insistence, he became enraged and instructed his wife to tell Mrs. Gardner they rejected the Rebman offer and would make no further offer on the Metairie property. He returned the Rebman offer to Mrs. Gardner the following day with a letter indicating rejection because of the financing condition and also rescinding the authorization mailed from Florida since no unconditional cash offer of $100,000.00 had been obtained by the September 22 deadline given to Mrs. Gossett. He did not, however, attempt to revoke the listing agreement which was still in effect.
[6] When asked that specific question, Mrs. Gossett responded as follows:

"Q. Did Mr. Reed tell you that he would accept an offer conditioned on financing provided you got the financing?
"A. Well, what would you think it meant if he says, `You may have two days for financing'?
"Q. The only thing they knew was what you were telling them on the telephone, is that right?
"A. Right.
"Q. And I suppose that it is at least possible that you misunderstood them or they misunderstood you?
"A. Well, I don't think we would be here if it weren't."
[7] Reed's stated reason for demanding an unconditional offer was that a low appraisal would tend to "peg the price" in the event the homestead loan was not completed for any reason, while an unconditional contract bound the purchaser regardless of the appraisal or of completion of the homestead loan. Expert testimony suggested that a low appraisal could be expected on the property because of unique characteristics and particular location.
[8] The obtaining of the commitment did not make the conditional offer become unconditional. The buyer's obligation still depended upon the performance of a third party, and if the homestead failed to complete the loan for any reason, Reed could not have enforced the contract.
[9] The offer did not specify a time for acceptance. Therefore, the offer could have been accepted within such time as the situation of the parties and the nature of the contract would reasonably require. C.C. art. 1802.