Judge MAX N. TOBIAS, JR.
_JjThe defendant, Regions Bank, appeals an adverse judgment rendered on 23 December 2013 in favor of the plaintiff, Nine-O-Five Royal Apartment Hotel, Inc., declaring the Regions Bank mortgage invalid and canceling the mortgage. For the following reasons, we affirm.

Factual Background and Procedural History

This matter involves the validity of a Multiple Indebtedness Mortgage and Security Agreement (“the Mortgage”) executed on 10 December 2003 by Donna Morell Rotonti (“Donna”) purportedly on behalf of Nine-O-Five Royal Apartment Hotel, Inc. (“Nine-O-Five”) in favor of Regions Bank (“Regions”), the successor by merger to AmSouth Bank (“AmSouth”). Regions avers that the doctrines of apparent authority and agency by estoppel apply, clothing Donna with authority to execute the Mortgage on behalf of Nine-O-Five and that, in any event, Nine-O-Five later ratified the Mortgage. Conversely, Nine-O-Five contends that Donna lacked authority, either actual or apparent, to execute the Mortgage binding Nine-O-Five and, consequently, the Mortgage is invalid.
Nine-O-Five is a closely held corporation that was formed by members of the Morell family and incorporated in 1964, with the controlling interest in the [{.corporation initially held by Marie S. Mo-rell (“Marie”). Marie had three daughters, who are involved in the instant case: Jane Morell (“Jane”), Joyce Morell (“Joyce”), and Donna.[1] Nine-O-Five’s primary asset is a small seven-room hotel located at 905 Royal Street in New Orleans (“the Property”). The record owner of the Property is and at all relevant times was Nine-O-Five. For many years, Jane and Joyce have operated the hotel located at the Property, whereas Donna has never been involved in its daily operation.
In the 1990’s, following Marie’s death, Nine-O-Five’s stock was placed in a family trust, with the understanding that Jane and Joyce are to remain in the Property for their lifetime, after which those rights are to succeed to Donna’s children, as successive beneficiaries. Since their mother’s death, Jane and Joyce have been the sole *742 officers and directors of Nine-O-Five. According to the corporate records filed by Nine-O-Five with the Louisiana Secretary of State, Donna has been neither an officer nor director of the corporation since 1984.
In February 2000, Nine-O-Five entered into a loan transaction with Whitney Bank (“Whitney”) in order to fund needed renovations to the Property. The loan was secured with a mortgage on the Property. Appearing as president, Joyce signed the Whitney mortgage on behalf of Nine-O-Five, with her authority to do so confirmed by a corresponding corporate resolution signed by Jane as Nine-O-Five’s secretary. Donna’s name does not appear anywhere on the Whitney mortgage, either as an officer or director of Nine-O-Five, or otherwise.
Two months later, in April 2000, Nine-O-Five borrowed an additional $175,000 from AmSouth in order to complete the renovations to the Property. |sThis time, Donna signed the AmSouth note as the corporate secretary of Nine-O-Five. The promissory note in favor of AmSouth contains the signatures of all three Morell sisters. Donna signed as secretary, Joyce as president, and Jane, individually, but not as an officer or director of Nine-O-Five. Additionally, the record contains a personal guarantee signed by Donna for the April 2000 AmSouth loan made to Nine-O-Five. Subsequent disbursement requests and authorizations made in connection with the AmSouth loan were also signed by all three.sisters.[2] In short, the record reveals that, except for Donna’s personal guarantee executed by her alone, all documents executed in connection with the April 2000 AmSouth loan transaction bear the signatures of all three Morell sisters on behalf of Nine-O-Five.[3]
On 10 December 2003, AmSouth made a personal loan to Donna and her husband, John Rotonti, in the amount of $525,000.[4] The loan was evidenced by a promissory note, entitled Note for Business and Commercial Loans (“the Note”), executed by Donna, individually, and as the agent and attorney-in-fact for John Rotonti. Nine-O-Five is nowhere mentioned or otherwise identified in the Note. |4The Note specifically provided, among other things, that AmSouth retained the right, in the event of default, to pay itself by drawing on any “moneys, securities and other property” of the Rotontis in the possession of, or on *743 deposit with, the bank. According to Donna’s testimony, she and her husband had approximately two million dollars in certificates of deposits with AmSouth.
On the same date that the loan transaction between the Rotontis and AmSouth took place, though Nine-O-Five was neither a maker nor a guarantor of the loan, Donna, purporting to act on behalf of Nine-O-Five, executed the Mortgage on the Property as security for the Rotontis’ personal loan with AmSouth.[5] The Mortgage purports to have been given by Nine-O-Five to AmSouth in order to secure the indebtedness and obligations arising under the Note given by Donna and John Roton-ti.[6] In connection with the Mortgage, Donna submitted a resolution, signed solely by her as the alleged secretary of Nine-O-Five, purportedly clothing her with the requisite authority on behalf of Nine-O-Five to execute the Mortgage. Specifically, the document states that by resolution of the Board of Directors of Nine-O-Five in November 2003, Donna was duly | sauthorized to execute the Mortgage on behalf of the corporation.[7] Neither Jane nor Joyce signed the resolution.
It is undisputed that Donna held no corporate office in Nine-O-Five at the time the Mortgage was executed in 2003, and had not held an office in the corporation for 19 years. At that time, the only officers and directors of the corporation were Jane and Joyce, who were solely responsible for the day-to-day operations of the hotel.[8] Moreover, contrary to the recitations contained in the resolution presented by Donna with the Mortgage to AmSouth, the testimony adduced at trial was that the shareholders or Board of Directors of Nine-O-Five did not meet in November 2003 and did not confer any authority upon Donna on that date, or on any other date, to act for or on behalf of Nine-O-Five in granting a mortgage or other lien or privilege on the Property. Additionally, Jane and Joyce testified that, while they had been aware of the prior Whitney loans[9] and mortgage, as well as the 2000 AmSouth loan, they knew nothing *744 about the December 2003 AmSouth loan made by Donna and John Rotonti or the Mortgage on the Property to secure that debt until several years following Hurricane Katrina, when they received a telephone call from someone at the bank (either AmSouth or Regions) advising that a mortgage loan apparently signed by Donna binding the | fihotel was in default. Jane contacted Donna to ask her about the loan, and was advised by Donna that she would be “taking care of it.”[10]
Subsequently, on 14 January 2009, Nine-O-Five filed a petition for mandamus seeking a declaration that the Mortgage was invalid and requesting that the Clerk of Court cancel the Mortgage inscription. In answer to Nine-O-Five’s petition, Regions (as AmSouth’s successor) affirmatively pled the defense of unjust enrichment[11] and the defense of fraud.[12] Regions’ answer does not affirmatively plead the defense of apparent authority or agency by estoppel.
The matter came for a bench trial on 2 December 2013. After considering the law and evidence submitted, the trial court rendered judgment on 23 December 2013, issuing written reasons, in favor of Nine-O-Five and against Regions, declaring that the Mortgage was invalid. The judgment further ordered the Clerk of Court, in her capacity as Recorder of Mortgages, to cancel the Mortgage. From this judgment, Regions appealed.

Issue Presented for Review

The sole issue before this court is whether the trial court was manifestly erroneous or clearly wrong in declaring the Mortgage to be invalid and, consequently, erred in ordering the Clerk of Court, in her capacity as Recorder of 17Mortgages, to cancel and erase all inscriptions and re-inscriptions of the Mortgage from the mortgage records of Orleans Parish.
Regions argues that the Morell sisters expressly held Donna out as Nine-O-Five’s corporate secretary in connection with a prior loan it obtained from Am-South, suggesting that she had the apparent authority to execute the Mortgage. Alternatively, Regions avers that Nine-O-Five ratified the unauthorized Mortgage by failing to repudiate it “within a reasonable time” and in accepting benefits of the Mortgage after learning of its existence.
Conversely, Nine-O-Five contends that Donna lacked authority, either actual or apparent, to execute the Mortgage on behalf of the corporation and, consequently, that the Mortgage is invalid. Nine-O-Five further argues that Regions failed to carry its burden of proof in establishing Nine-O-Five’s ratification of the unauthorized act.

*745
Standard of Review

Regions seeks a de novo review of the record averring that because the trial judge failed to consider the doctrine of apparent authority/agency by estoppel and misapplied the law on ratification, this court must review the entire record and render judgment on the merits, without according any weight to the trial court’s decision. La. Const. art. V, § 10(B); Chambers v. Village of Moreauville, 11-0898, p. 4 (La.1/24/12), 85 So.3d 593, 597. We disagree. Having determined that the court properly applied the law to the facts, we conclude that the manifest error/clearly wrong standard is the appropriate standard of review to be applied in this case. Under this standard, a court of appeal may not set aside a trial court’s finding of fact in the absence of “manifest error” or unless it is clearly wrong. Touchard v. Slemco Elec. Foundation, 99-3577, p. 5 (La.10/17/00), 769 So.2d 1200, 1204. When a conflict in the testimony exists, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are reasonable. Lirette v. State Farm Ins. Co., 563 So.2d 850, 852 (La.1990); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Therefore, the issue for the reviewing court is not whether the trier of fact was wrong, but whether the factfinder’s conclusions were reasonable under the evidence presented. Rosell, 549 So.2d at 844-45. When a fact-flnder’s determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Id. Applying the “manifest error” standard of review to the instant case, we find the trial court did not err in determining that the Mortgage was invalid or in canceling the Mortgage.

Discussion

A mortgage is a nonpossessory right created over property to secure the performance of an obligation. La. C.C. art. 3278. A mortgage is accessory to the obligation that it secures and can only be enforced, except as otherwise provided by law, to the extent of the obligation it secures. La. C.C. art. 3282. Mortgages are of three types: conventional, legal and judicial. La. C.C. arts. 3283, 3284. Within the area of conventional mortgages, three different forms of mortgages are recognized by the Louisiana statutes and jurisprudence: an “ordinary mortgage” (La. C.C. arts. 3287, 3290-3295); a mortgage to secure future advances (La.C.C. art. 3298); and a collateral mortgage.[13]
*746 |9The Mortgage involved in the instant case is a mortgage to secure future obligations under La. C.C. art. 3298. With this kind of mortgage, the promissory note secured by the mortgage need not be par-aphed for identification with the mortgage and need not recite that it is secured by the mortgage. La. C.C. art. 3298 C. The Note executed by Donna, individually, and as the agent and attorney in fact for her husband, John Rotonti, is not paraphed; in fact, nothing in the Note ties it to the 'Mortgage. Specifically, the Note does not identify Nine-O-Five as the maker of the Note, and the Note likewise does not identify in any way that Donna is the agent-in-fact for, or has the authority to act on behalf of, Nine-O-Five. The Note specifically identifies John Rotonti and Donna as the borrowers of the $525,000. The HUD 1 settlement statement merely establishes how the makers of the Note, Donna and John Rotonti, wanted the funds to be disbursed. And, while the HUD 1 settlement statement identifies a “File 31511A,” this identification number does not correspond with either the Note or the Mortgage in this case.
The trial court held that the Mortgage executed by Donna is invalid and neither legally binds Nine-O-Five nor bears on the Property because (1) Donna did | ,nnot have express or written authority to execute the Mortgage on the corporation’s behalf and (2) Nine-O-Five did not ratify Donna’s unauthorized acts. We agree.
1. Donna’s Authority to Execute the Mortgage
Regarding Donna’s authority to execute the Mortgage, we quote approvingly the trial judge’s reasons for judgment on this issue:
Under La. Civil Code Article 2996, an agent must have express authority to “encumber” immovable property and under Civil Code Article 2997(3) to contract a loan. Articles 2996 and 2997 apply to officers and representatives of corporations. It is undisputed that Donna had no express authority to grant the 2003 mortgage or to contract the 2003 loan.
Under La. Civil Code Article 3287, a conventional mortgage may be established only by a written contract. Under La. Civil Code Article 2993, when the law prescribes a certain form for an act, a mandate authorizing the act must be in that form. Since a mortgage must be in writing, any authority granted by the Company [Nine-O-Five] for Donna to grant the 2003 mortgage must also have been in writing. The formality requirements imposed by law on a particular type of transaction apply equally to a principal’s purported authorization of an agent’s authority to enter into such transactions. Holloway v. Shelter Mut. Ins. Co., 861 So.2d 763 (La.App. 3d Cir.2003).
Authority to encumber real estate of a corporation may be granted only by resolution of the corporate board of directors in regular proceedings expressly authorizing the representative of the corporation to execute the mortgage on behalf of the corporation. Marsh Investment Corp. v. Langford, 490 F.Supp. 1320, 1327 (E.D.La.1980). Under Louisiana law, any action taken in the name *747 of a corporation that is unauthorized by the corporation cannot bind the corporation. Id. at 1324, citing Margolis v. Allen Mortgage Corp., 268 So.2d 714 (La.App. 4th Cir.1972).
As established by the records of the Louisiana Secretary of State and by the testimony of both Jane and Joyce Mo-rell, Donna Morell was neither an officer nor a director of the Company [Nine-O-Five] at the time Donna signed the 2003 mortgage, and Jane and Joyce [nhad not authorized her to execute the 2003 mortgage on behalf of the Company [Nine-O-Five]. The Company [Nine-O-Five] never granted Donna express, written authority to execute the 2003 mortgage on the Company’s [Nine-O-Five’s] behalf. Therefore, the Court finds that the 2003 mortgage Donna executed is clearly invalid.
On appeal, Regions does .not dispute that Donna-did not have express or written authority to execute the Mortgage, but rather, argues that the trial court erred in failing to consider and apply the doctrines of agency by estoppel or apparent authority, and by failing to hold Nine-O-Five bound by Donna’s execution of the Mortgage on its behalf.
In Tedesco v. Gentry Dev. Inc., 540 So.2d 960, 961 (La.1989), the Louisiana Supreme Court addressed the issue of whether the doctrines of apparent authority and agency by estoppel[14] are applicable in cases involving a contract to sell immovable property. Although the Court confirmed that, under La. C.C. arts. 2996, 2997, and 2440, “written authority” is required for an agent to execute either an agreement to sell or a contract of sale of immovable property, it acknowledged that the doctrine of agency by estoppel could bar a principal “from asserting the defense of lack of written authority if the third person can show a change of position in reliance on the representation” of the principal. Id. at 964. The Court noted that the third person’s reliance on the agent’s purported authority must be | ^“reasonable.” Id. The Court further explained that the required showing of a “change of position” includes, among other things, the “payment of money” and occurs when “money has been paid to the agent or other transactions have been undertaken or abandoned in reliance on the contract.” Id. at 965, citing Restatement, supra § 8B.
Relying on Tedesco, Regions avers that the trial evidence established that, by their previous representations, Jane and Joyce gave AmSouth every reason to believe that Donna was Nine-O-Five’s agent and vested with full authority to enter into the loan transactions on its behalf, and that Regions changed its position in reliance on those previous representations.[15] Specifi *748 cally, Regions contends that AmSouth reasonably believed that Donna had authority to unilaterally execute the Mortgage in 2003 on behalf of Nine-O-Five because, in 2000, three years earlier, Donna had: (1) guaranteed the original Whitney mortgage, (2) signed the previous AmSouth .note for $175,000 as Nine-O-Five’s corporate secretary (which note was also signed by Jane and Joyce), (3) executed disbursement requests in connection with the 2000 AmSouth loan as secretary for Nine-O-Five (which documents were also each signed by both Jane and Joyce), and (4) serviced the Whitney and AmSouth debt personally. Additionally, Regions contends that a significant change in position by AmSouth occurred when it entered into the 2003 loan and Mortgage in reliance on its reasonable belief that Donna was authorized to execute the Mortgage on behalf of Nine-O-Five. According to Regions, evidence of this “significant change” is established by the fact that all of the loan proceeds secured 11sby the Mortgage were used to pay off and satisfy the prior Whitney and AmSouth debt, to pay closing costs, and to provide $130,015.57 in additional working capital to Nine-O-Five.[16]
Consequently, Regions avers that because the trial evidence established both its reasonable reliance on Nine-O-Five’s representations and its change of position, to allow Nine-O-Five to deny the agency in order to avoid the obligation to repay the funds that refinanced and cancelled the prior loans that were used to renovate the Property would be unjust. We disagree.
We first note that, while Regions did affirmatively plead the defenses of unjust enrichment and fraud, it is undisputed that Regions did not expressly plead the affirmative defense of apparent authority or agency by estoppel, which is required.[17] Nonetheless, we disagree with Regions’ contention that the trial court did not consider these affirmative defenses when it declared the Mortgage invalid. At the close of trial, the trial judge requested that counsel for the parties submit memoranda of law supporting their respective positions. The record evidences that on 10 December 2013, prior to rendition of judgment, Regions filed proposed reasons for judgment, which alluded to these defenses. We find that, based on the 114evidence presented at trial, the trial judge merely rejected the applicability of these defenses in the instant case.
Our review of the trial exhibits confirms that at no time did Nine-O-Five, Jane or Joyce represent or manifest to AmSouth (or Regions) that Donna was authorized to execute the Mortgage binding Nine-O-Five’s single asset. Moreover, we find *749 that Regions failed to establish that Am-South’s reliance on the alleged “previous representations” was reasonable. First, the documents upon which Regions relies to establish Donna’s apparent authority and/or agency to bind the corporation were executed in 2000 — three years prior to her execution of the Mortgage it seeks to enforce. A due diligence inquiry by the bank to the Louisiana Secretary of State or even perusal of its corporate data base would have confirmed that Donna was neither an officer nor director of Nine-O-Five in 2003, or for the many years prior. Second, those documents executed in 2000 bear the signatures of all three Morell sisters and do not confer any authority upon Donna to act alone to bind the corporation. Third, regarding the 2003 corporate resolution signed solely by Donna in conjunction with the execution of the Mortgage, the testimony at trial from Jane and Joyce was that no shareholders’ meeting took place in November 2003, and at no time was Donna ever given the unilateral authority to mortgage the Property.
Based on this evidence, we find that, even if the pleadings were expanded to conform to evidence presented at trial relating to the affirmative defenses of apparent authority and/or agency by estoppel, Regions did not carry its burden of establishing that Nine-O-Five represented to AmSouth that Donna was authorized 11Bto unilaterally act on its behalf in executing the Mortgage binding the Property, or that the bank reasonably relied on anything said or done by Nine-O-Five.[18] Thus, we need not address whether Am-South (or Regions) established a change of position.
Accordingly, we find the trial court did not err by failing to apply the doctrine of apparent authority and/or agency by es-toppel in this case or in determining the Mortgage to be invalid. Ultimately, the bank’s failure to exercise due diligence to confirm whether the Mortgage it took was valid is fatal to their defense.
2. Ratification of the Mortgage
Regions avers that the trial court misapplied the law on ratification, and should have found that, even if the Mortgage was unauthorized, Nine-O-Five ratified the Mortgage by failing to repudiate it “within a reasonable time” and in continuing to accept the benefits of the Mortgage even after learning of its existence.
La. C.C. art. 1843 defines ratification as follows:
Ratification is a declaration whereby a person gives his consent to an obligation incurred on his behalf by another without authority.
An express act of ratification must evidence the intention to be bound by the ratified obligation.
Tacit ratification results when a person, with knowledge of an obligation incurred on his behalf by another, accepts the benefit of that obligation.
| is On the issue of ratification, the trial judge found in favor of Nine-O-Five for the following reasons, which we find from our review of the record not to be manifestly erroneous or clearly wrong:
As a matter of law, the person claiming ratification has the burden of proving ratification by clear and convincing evidence. Quilio & Associates v. *750 Plaquemines Parish Government, 05-0803 (La.App. 4 Cir. 05/10/06), 931 So.2d 1129, 1137. The facts must show a clear and absolute intent to ratify the previously unauthorized act. Nationwide Finance Co. of Gretna v. Pitre, 243 So.2d 326 (La.App. 4th Cir.1971). Regions Bank has failed to meet its burden of proof.
In this case, no evidence suggests, let alone proves, any express ratification of the invalid mortgage, i.e., the Company [Nine-O-Five] never made “a declaration” “evidenc[ing] the intent to be bound.” La. Civil Code art. 1843, paragraph 1 and 2.
In the absence of an express ratification, Regions Bank argued that the Company [Nine-O-Five] tacitly ratified the mortgage because Jane and Joyce Morell supposedly accepted the benefit of the mortgage because part of the money from the mortgage was used by Donna to pay off a prior 2000 Whitney Bank loan by the Company [Nine-O-Five]. Hence, Regions Bank essentially avers that its mortgage should be recognized at least to the extent of approximately $250,000 that was used to pay off the Whitney Bank mortgage.
The Court finds no such tacit ratification.
The jurisprudence under article 1843 provides that in order for a person to ratify an unauthorized act, the person must have full knowledge of the unauthorized act and the details of the obligation that he would be incurring by virtue of the ratification. Sanchez v. Sanchez, 464 So.2d 1009, (La.App. 1 Cir.1985); and Rebman v. Reed, 335 So.2d 37 (La.App. 4 Cir.1976). In addition, the person ratifying the act must clearly and unequivocally manifest an intent to be bound by the obligation. Id. Here, the Company [Nine-O-Five] did not have full knowledge of Donna’s unauthorized act or of the 117obIigation of the 2003 mortgage. Moreover, the Company [Nine-O-Five] did not clearly and unequivocally manifest an intent to be bound by the obligation of the 2003 mortgage. The evidence shows that neither Jane nor Joyce Morell had any knowledge whatsoever that Donna was going to or had mortgaged the property to AmSouth Bank. They did not learn anything about the transaction until called by someone from the bank advising that there was a delinquency on an account, which had previously been unknown to them. They contacted Donna who apparently advised that she would take care of it. That is the totality of the evidence put forth at trial. There was no evidence of any correspondence or oral communication whereby either Jane or Joyce communicated anything to Regions Bank or AmSouth Bank that could be construed as a ratification. There is no evidence that they knew any details at all until they hired counsel to cancel the mortgage by way of this lawsuit. That Donna may have used some of the money she and John borrowed to pay off a prior mortgage does not validate the 2003 mortgage. First National Bank v. Crawford, 455 So.2d 1209 (La.App. 2d Cir.1984), writ denied, 459 So.2d 538 (La.1984) (finding no tacit ratification of unauthorized mortgage where portion of loan proceeds were used to refinance an existing debt of the mortgagor; also rejecting as a matter of law the bank’s unjust enrichment claim).
First, Regions argues that Nine-O-Five ratified the Mortgage because it failed to repudiate the Mortgage within a reasonable period of time. Regions avers that the trial court should have applied the following law relative to ratification:
*751 Ratification occurs when someone with the authority to bind the corporation acquires knowledge of the unauthorized act and thereafter fails to repudiate it within a reasonable period of time. This rule is particularly applicable when the delay is a long one, the failure to repudiate is accompanied by acts indicating approval of the unauthorized act, or the circumstances call for a quick repudiation.[19]
_[_|gWhile we agree with Regions, in part, that this is a correct statement of the law, we would also add that the party seeking ratification bears the burden of proving “a clear and absolute intent to ratify the previously unauthorized act.” Our review of the evidence and testimony presented at trial leads us to conclude that Regions did not meet its burden of establishing that Nine-O-Five’s actions evidenced a clear intent to ratify the Mortgage.
In its brief on appeal, Regions repeatedly states, as if it is an established fact, that Nine-O-Five acquired knowledge of the Mortgage at least “three years” prior to taking any action to repudiate it, and contends that this “three to four year” delay was unreasonable. The evidence, however, does not support Regions’ contention. All we know from the record is that at some point in time following Hurricane Katrina, which struck New Orleans on 29 August 2005, Nine-O-Five received a telephone call from Regions advising that a mortgage loan on the Property was delinquent. Neither Jane nor Joyce could state exactly when that call from the bank was received; however, they both testified unequivocally that, until receiving that call, they knew nothing about the Mortgage. And, according to Donna, she herself continued paying the Mortgage loan until “way past Katrina,” so we can only assume that the call from Regions likewise did not take place until “way past Katrina.” We find it hard to fathom that Regions, as the corporate lender servicing the loan and Mortgage, did not have records on file from which it could establish the exact date the Mortgage went into default and when the call was made to Nine-O-Five advising of the delinquency. The fact that Regions did not put forth such evidence is curious and, further, defeats their ability to prove ratification in this case. Without a specific time line of events, we find that Regions failed to put on Insufficient evidence to prove that Nine-O-Five, once receiving notice of the Mortgage, failed to take action to repudiate it within a reasonable time.
Next, Regions contends that, after acquiring knowledge of the Mortgage, Nine-O-Five continued to accept the benefits of the Mortgage, and therefore it should be deemed to have ratified the unauthorized Mortgage. Again, the facts do not support Regions’ position.
Tacit ratification requires that the principal first acquire knowledge and then accept the benefit of the unauthorized act. La. C.C. art. 1843. It is established that Jane and Joyce did not gain knowledge of the Mortgage on the Property until some point in time “way past Katrina,” when they received the telephone call from Regions that the loan was in default. In its brief on appeal, Regions acknowledges that “[t]he direct, immediate benefit of the Mortgage to Nine-O-Five was to refinance the earlier Whitney Bank and AmSouth loans.” [Emphasis supplied.] As evidenced by the HUD I settlement state- *752 merit and the checks issued by the title company at the closing, all of the funds under the Mortgage — ie., all benefits of the unauthorized act — were disbursed by the bank on 10 December 2003 before Nine-O-Five acquired knowledge of the unauthorized Mortgage, which occurred many years later after Katrina. No evidence was submitted showing that any further disbursements were made subsequent to that date.
|2qNonetheless, Regions contends that the testimony of Jane and Joyce shows that after Nine-O-Five was contacted by Regions and advised of the Mortgage on the Property, Nine-O-Five did, in fact, accept a benefit of the unauthorized Mortgage because it allowed Donna to continue to make payments to service the Mortgage debt on its behalf in order for Nine-O-Five’s hotel business to survive.[20] In support of its contention, Regions points to the following trial testimony given by Joyce:
Q. You understood by the time, after you got this phone call about the Regions loan, the initial phone call, that there was a mortgage in favor of Am-South that your sister Donna had executed?
A. Yes.
Q. You learned that at that point?
A. Some time [sic] during that time, yes.
Q. And you allowed Donna to continue to make payments on behalf of the hotel, even after you learned that; correct?
A. She said she was going to make payment on it, yes.
Q. And you were okay with that? You didn’t object at that time?
A. As long as she paid it.
Again, we find the evidence does not comport with Regions’ assertions. First, it is important to note that the loan on which Donna was making payments was a personal loan made by Donna and John Ro-tonti, which debt was secured by the Mortgage on the Property. It is not surprising that Joyce (and Jane) would not have a problem with Donna paying off her own personal debt. Next, we do not find that Joyce’s testimony supports Regions’ purported timetable of events, such that (1) Donna stopped paying on the loan; (2) Regions made an “initial” telephone call to Jane and Joyce advising them of the Mortgage, which was in default; (3) the sisters spoke with Donna about the Mortgage who said that she would take care of it; (4) instead of taking any action to repudiate the Mortgage, Nine-O-Five allowed Donna to resume making payments for a period of time until way past Katrina (for approximately three years) when she could no longer make them, causing the loan 121to again become delinquent; (5) a second telephone call was made by Regions to Nine-O-Five notifying Jane and Joyce of the second default; and (6) though Nine-O-Five had knowledge of the Mortgage, it took steps to repudiate the Mortgage only after receiving the benefit of Donna’s resumed payments for a time on its behalf. Nowhere in the testimony, or elsewhere in the record, is there evidence establishing that Regions made more than one telephone call to Nine-O-Five or that Donna actually made additional loan payments after she assured her sisters that she would “take care of it.” While Joyce admitted that once she was made aware of the Mortgage, she was okay with Donna mak *753 ing additional payments on behalf of Nine-O-Five, the testimony does not confirm or even suggest that additional payments by Donna were, in fact, actually made.
Regions bore the burden at trial to prove its ratification defense. In this regard, we find that Regions fell substantially short. As noted previously, Regions most certainly possessed records that could prove or, at the very least, infer how many (if more than one) telephone calls Regions actually made to Nine-O-Five concerning Donna and John’s loan and the Mortgage on the Property, exactly when the call(s) took place, and whether Donna actually made payments on her loan subsequent to Nine-O-Five acquiring knowledge of the Mortgage via the telephone call from Regions. Regions introduced no evidence or testimony proving these facts and, consequently, fell short of carrying its burden of proof establishing Nine-O-Five’s ratification of the unauthorized Mortgage based on its having received a benefit of the Mortgage after receiving notice of it.
| ^Regions further advances that Nine-O-Five benefited from the Mortgage because, at the time the loan monies were dispersed at the December 2003 closing, over $130,000 was dispersed to Nine-O-Five as additional working capital. We find that Regions failed to prove this contention at trial. The testimony of both Jane and Joyce was that they knew nothing about the 2003 AmSouth loan or Mortgage, which would arguably include a lack of knowledge as to how the loan proceeds were dispersed. In evidence is a check made payable to Nine-O-Five in the amount of $130,015.57, but the back of the check shows endorsement of the check into an AmSouth account. Regions presented no evidence identifying that account as being associated in any way with Nine-O-Five. In fact, the evidence presented at trial suggests that Nine-O-Five’s corporate accounts were at Whitney, not Am-South.[21] The only testimony about the check came from Donna, who testified that she could not identify the account, but conceded that it could have been one of her personal accounts. Again, as a part of its ratification defense, it was incumbent upon Regions to establish where that money went, and since it went into an Am-South account, one can only assume that the identifying information regarding the mystery account was within Regions’ ability to produce. The only logical conclusion to draw from Regions’ failure to do so is that the money did not go to Nine-O-Five as Regions suggests.
The trial court, citing First National Bank v. Crawford, supra, stated, “[t]hat Donna may have used some of the money she and John borrowed to pay off a prior mortgage does not validate the 2003 mortgage.” Regions avers the Crawford case is distinguishable from the Mortgage at issue herein and that the trial court erred in applying its reasoning to the instant case. We disagree.
| ¾¾⅛ Crawford, the bank sued to collect on a promissory note and for recognition of a mortgage. Mrs. Crawford owned an undivided one-half interest in 640 acres. Mrs. Crawford gave to her daughter, Mrs. Howe, a full and general power of attorney over her affairs.[22] Using the power of *754 attorney granted by her mother, Mrs. Howe mortgaged Mrs. Crawford’s ownership interest in 640 acres to secure a bank loan made by Mrs. Howe and her husband. Part of the proceeds paid off a pre-existing mortgage and loan that Mrs. Crawford herself had made, but most of the remaining proceeds were used solely for the benefit of Mrs. Howe and her husband in an effort to salvage their floundering dairy business. While Mrs. Howe testified that she had advised her mother of the note and mortgage, Mrs. Crawford denied any knowledge of the transaction until the bank foreclosed and suit was filed, and denied that she had authorized her daughter to use the power of attorney for purposes of securing a personal loan for her business.[23]
At trial, the bank argued that Mrs. Howe had authority under the general power of attorney to execute the mortgage and that her mother had ratified the mortgage. To the contrary, the court determined that while the power of attorney granted Mrs. Howe the authority to mortgage Mrs. Crawford’s property for the account of Mrs. Crawford, it did not purport to authorize Mrs. Howe to mortgage her mother’s property to secure a personal loan made to Mrs. Howe and her husband. Crawford, 455 So.2d at 1213.
^Similarly, in the instant case, the Mortgage binding Nine-O-Five was used to secure the 2003 AmSouth loan, which was a personal loan made to Donna and John Rotonti, not Nine-O-Five. Unlike each of the other documents put into evidence by Regions where all three Morell sisters signed binding the corporation, only Donna, individually, signed the Mortgage securing her personal loan. The resolution purportedly clothing Donna with authority to execute the Mortgage and bind Nine-O-Five was also signed only by her. Arguably, these facts should have raised some questions for AmSouth concerning the Mortgage; however, most likely because the Mortgage was actually additional security for the personal loan made to Donna and John Rotonti, given that the Rotontis had over $2 million in certificates of deposit at the bank, AmSouth did not “cross its Is and dot its Ts” regarding the Mortgage. AmSouth’s failure to do so was to its detriment.[24]
Regions attempts to distinguish Crawford on the basis that Mrs. Crawford did not receive any benefit from her daughter’s loan, the proceeds of which went to rescue the daughter’s own failing business in which Mrs. Crawford played no part and derived no benefit, whereas Nine-O-Five directly benefitted from Donna’s personal loan, at least to the extent the hotel’s prior indebtedness was satisfied, allowing the hotel to complete renovations and continue operations. Moreover, Regions argues that the Crawford court rejected the bank’s ratification defense on the basis that the bank failed to show that Mrs. Crawford knew anything about the mortgage encumbering her property until the *755 bank instituted foreclosure proceedings, whereas in the instant case, Nine-O-Five was aware of the Mortgage [^binding the hotel for “at least three years” before taking action to repudiate it. By doing so, Regions argues that Nine-O-Five consciously chose not to challenge the Mortgage, but rather, to accept the benefit of Donna continuing to make payments on the Mortgage on Nine-O-Five’s behalf. We disagree. As stated at length, supra, Regions failed to produce sufficient evidence establishing how much time elapsed between Nine-O-Five’s notice of the Mortgage (sometime “way past Katrina”) and January 2009, when Nine-O-Five filed the instant suit to repudiate it. Moreover, the Crawford court further rejected the bank’s ratification defense because it failed to submit evidence showing that Mrs. Crawford had a clear intent to ratify the note and mortgage, which could not be inferred from the facts of the case. In the case sub judice, we too find that Regions failed to establish that Nine-O-Five (i.e., Jane or Joyce) clearly intended to ratify the Mortgage and, based on the dearth of evidence introduced at trial, we decline to infer such intent from the scant facts and testimony presented. Ratification was not established.
Alternatively, Regions posits an equitable argument that, even if Nine-O-Five did not directly receive any proceeds (ie., the $130,015.57) from the Mortgage, this court should reverse the trial court and issue a judgment that the Mortgage is valid and enforceable to the extent the Mortgage proceeds were used to pay off the previous debt owed by Nine-O-Five to Whitney and AmSouth, or up to $379,764.63. According to Regions, because Nine-O-Five has not contested its liability for those earlier debts, and does not dispute that it benefited from the use of those funds to renovate the hotel and keep it operational, Nine-O-Five should not be allowed to reap the benefit from Regions’ payment of those loans while 12(jinequitably depriving Regions of the security it bargained for in exchange for the payment of Nine-O-Five’s debts.
In response to what amounts to be a claim by Regions to validate the invalid mortgage on the basis of unjust enrichment, we note that the law does not provide such a remedy. La. C.C. art. 3281 provides that a “[mjortgage may be established only as authorized by legislation.” [Emphasis supplied.] La. C.C. arts. 3283 and 3284 provide only three modes of establishing a mortgage: a conventional mortgage (established by contract); a legal mortgage (established by operation of law); and, a judicial mortgage (established by law to secure a judgment). Mortgages, like liens, are stricti juris, and cannot be created by equitable considerations. State of Louisiana v. Atlas Pipeline Corp., 33 F.Supp. 160, 167 (W.D.La.1940); see also Security Homestead Ass’n v. Schnell, 232 So.2d 898, 900 (La.App. 4th Cir.1970). Moreover, pursuant to La. C.C. art. 4, only “[w]hen no rule for a particular situation can be derived from legislation or custom,” must the court resort to proceeding “according to equity.” In the instant case, the Civil Code specifically provides for the manner in which mortgages may be established. No codal provision or statute contemplates the creation of a mortgage utilizing equitable principles such as unjust enrichment. Because Regions’ claim for a limited mortgage on the Property is not provided for by law, it must fail.[25]
*756 ^CONCLUSION
For the foregoing reasons, we affirm the trial court’s judgment invalidating the Mortgage on the Property and ordering that it be erased.

AFFIRMED.

. At all times pertinent to the execution of the mortgage instrument at issue in this lawsuit, Joyce was the president and Jane was the secretary/treasurer of Nine-O-Five. Joyce and Jane were also trustees and beneficiaries of the trust which owns stock in the corporation.

. While the promissory note and disbursement requests evidence signatures by all three sisters, Joyce denied at trial that the signatures bearing her name on these documents were hers.

. Contained in the record is a "Corporate Resolution to Borrow” related to Nine-O-Five's April 2000 AmSouth loan transaction. The language contained in this document specifically requires that execution of a loan or mortgage on behalf of Nine-O-Five requires the signatures of all three of the Morell sisters. Regions argues that, even though this particular corporate resolution is physically contained in the record, because the document was not introduced as evidence at trial by either party (although it was listed as a trial exhibit by Regions), this court may not consider the document on appeal. The corporate resolution was attached as an exhibit to a memorandum filed by Regions in opposition to a motion for summary judgment filed by Nine-O-Five in May 2010. Due to the other evidence properly introduced at the trial of this matter showing that all other documents executed on behalf of Nine-O-Five in connection with the April 2000 AmSouth loan transaction bear the signatures of Donna, Joyce and Jane, we find that consideration of this document is unnecessary and does not alter the result we reach, one way or the other.

. According to Regions, Nine-O-Five — not the Rotontis — borrowed the $525,000 from Am-South to refinance three outstanding loans (with Whitney and AmSouth) and to obtain $130,014.57 in new money as working capital.

. On 22 December 2003, AmSouth Bank did cause to be recorded against the Property in the mortgage records for the Parish of Orleans, the Mortgage dated 10 December 2003, in the maximum amount of $50,000,000.

. The HUD 1 settlement statement indicates that the proceeds of the $525,000 loan were disbursed as follows:
Payoff 1st Mortgage to Whitney National Bank — $254,146.76
Payoff 2nd Mortgage to Whitney National Bank — $10,835.05
Payoff April 2000 loan to AmSouth— $125,617.87
Cash to Borrower (Nine-O-Five)— $130,015.57
Closing Costs — $4,384.74
According to Donna, she paid and serviced the 2003 AmSouth loan with her own personal funds, and she continued to pay the Mortgage as long as she could up until sometime “way past Katrina” when her own personal financial situation changed. Donna further contends that, while Nine-O-Five may have made payments from time to time on the previous Whitney and AmSouth loans, no payments towards the December 2003 loan were ever made by Jane, Joyce or Nine-O-Five.

. A review of Page 1 of the Mortgage shows that Donna appeared as the president of Nine-O-Five. According to Donna's testimony, she believed that, at one time, she may have been the president of the corporation, however, other evidence submitted at trial refutes this belief.

. According to the trial testimony, Joyce was the Morell sister responsible for taking care of Nine-O-Five's books.

. The record indicates that prior to the December 2003 loan transaction with AmSouth, and in addition to the April 2000 loan and mortgage with Whitney, Nine-O-Five also had a line of credit at Whitney that was used in connection with the hotel’s operations.

. On 10 January 2008, the Note matured and the balance became due.

. Regions' unjust enrichment claim was based on the premise that Nine-O-Five did not complain about the existence of the alleged “unauthorized” Mortgage until after the loan proceeds had already been used to pay off prior mortgage indebtedness owed by Nine-O-Five to AmSouth and Whitney solely to Nine-O-Five’s benefit. Accordingly, Regions averred that Nine-O-Five should be made to return all of the proceeds which have been paid to reduce its outstanding indebtedness before that Mortgage can be cancelled.

. In its answer, Regions asserted the defense of fraud on the basis that substantial funds were loaned and used to the benefit of Nine-O-Five based upon fraudulent information submitted to Regions in order to obtain the loan. According to Regions, once Nine-O-Five learned about the existence of the loan and that its indebtedness had been paid to AmSouth in full, Nine-O-Five failed to return the funds, which, effectively, perpetuated the fraud. Regions failed to present evidence at trial to support its fraud defense, and it has not urged this defense on appeal.

. Unlike the other two forms of conventional mortgages, a collateral mortgage is not a "pure” mortgage; rather, it is the result of judicial recognition that one can pledge a note secured by a mortgage and use this pledge to secure yet another debt. A collateral mortgage indirectly secures a debt via a pledge and consists of at least three documents: a promissory note (usually called a collateral mortgage note or a "ne varietur” note); a mortgage (which provides the creditor with security in the enforcement of the promissory or collateral mortgage note); and, a hand note or pledge. While a collateral mortgage appears to be identical to both a mortgage to secure future advances and an ordinary mortgage, it is distinct in that in the collateral mortgage situation, money is not directly advanced on the note that is par-aphed for identification with the act of mortgage. Rather, the collateral mortgage note and the mortgage which it secures are pledged to secure a debt. See First Guaranty Bank v. Alford, 366 So.2d 1299, 1302 (La.1978). The pledge is an accessory contract by which one debtor gives something to a creditor as security for the debt. La. C.C. art. 3133. A person may give a pledge not only for his own debt, but also for that of another. La. C.C. art. 3141. The pledge secures only that debt or debts contemplated in the contract between the pledgor and pledgee. Al *746 ford, 366 So.2d at 1304. See also. Diamond Services Corp. v. Benoit, 00-0469 (La.2/21/01), pp. 6-7, 780 So.2d 367, 371. The collateral mortgage was designed "to create a mortgage note that can be pledged as collateral security for either a pre-existing debt, or for a debt created contemporaneously with the mortgage, or for a future debt or debts, or even for a series of debts.” Max Nathan, Jr. & H. Gayle Marshall, The Collateral Mortgage, 33 La. L.Rev. 497 (1973).

. The Restatement (Second) of Agency § 8 (1958) "makes a clear distinction” between apparent authority and agency by estoppel. “According to the Restatement, apparent authority is based on the objective theory of contracts that a party ought to be bound by what he says and manifests rather than by what he intends, so that a third person who contracts with an agent need only prove reliance on the appearance of authority manifested by the principal. Because an enforceable contract results from the agreement with the agent after the principal's conduct has manifested his consent, the third person need not prove any change of position induced by the reliance. On the other hand, agency by es-toppel is based on tort principles of preventing loss by an innocent person. The third person not only must show reliance on the conduct of the principal, but also must show such a change of position on his part that it would be unjust to allow the principal to deny the agency. Restatement, supra § 8, comment d.” Tedesco, 540 So.2d at 964.

. Specifically, regarding a change of its position, Regions avers that, in exchange for the Mortgage, the 2003 AmSouth loan proceeds *748 were used to pay-off and satisfy the prior Whitney and AmSouth debt.

. Though Nine-O-Five is designated on the HUD 1 settlement statements as one of the ■entities to whom funds were to be disbursed, the record does not establish that Nine-O-Five was ever aware of or ever received those particular funds. Joyce, the sister responsible for the day-to-day operations of the hotel, including keeping the hotel’s books and paying its bills, specifically denied knowledge and/or receipt of these funds.

. At oral argument, counsel for Regions argued that, while Regions did not expressly assert the affirmative defense of apparent authority or agency by estoppel, the pleadings were expanded under La. C.C.P. art. 1154 to conform to the evidence presented at trial ' establishing these affirmative defenses and by legal arguments made in memoranda previously submitted to the court (i.e., Regions’ memorandum in opposition to Nine-O-Five’s motion for summary judgment and Regions’ proposed reasons for judgment). We note that the record does not establish that Nine-O-Five’s motion for summary judgment was ever set for hearing or actually heard by the court, thus it is unclear whether the issues and arguments raised therein were ever considered by the trial court.

. The evidence in the record strongly supports the inference that, in 2003, with Donna and John Rotonti having over $2 million dollars in assets on account at the bank, when they presented to AmSouth for the loan, Am-South determined that the Rotontis were a good loan risk. Clearly their existing assets secured the amount of the loan as evidenced in the Note.

. Regions cites Buffone v. Mangano, 12-0819, p. 6 (La.App. 4 Cir. 5/17/13), 116 So.3d 922, 926 and L & L Industries, Inc. v. Progressive Nat'l Bank, 535 So.2d 1156, 1159 (La. App. 2d Cir.1988) for its statement.

. Regions avers that, not until in 2009, when Donna became unable to continue to make the loan payments, did Jane and Joyce contest her authority to execute the Mortgage, and they’ve made no effort to repay any of the monies used to renovate the hotel from which they continue to benefit.

. Nine-O-Five had a line of credit for the operation of the hotel at Whitney.

. The power of attorney executed by Mrs. Crawford naming Mrs. Howe as her agent, granted to Mrs. Howe the full and general power to manage, administer, and control the affairs of Mrs. Crawford. As agent, Mrs. Howe was "expressly authorized to borrow money for the account of the principal [Mrs. Crawford] and to grant mortgages on real estate as security for any amount borrowed for and on behalf of the principal [Mrs. Craw *754 ford] ... for the management and preservation of the principal's [Mrs. Crawford’s] estate.” Crawford, 455 So.2d at 1212.

. Mrs. Crawford took no part in the management of her daughter's business, which was operated solely by Mrs. Howe and her husband, and she received no benefits from it. Crawford, 455 So.2d at 1212.

. In Buckley v. Woodlawn Development Corporation, 233 La. 662, 680, 98 So.2d 92, 98 (1957), the Supreme Court noted that "[w]ho-ever deals with an agent is put on his guard by the very fact and does so at his risk. It is his right and duty to inquire into and ascertain the nature and extent of the powers of the agent and to determine whether the act or contract about to be consummated comes within the province of the agency and will or not bind the principal.’’

. The moral maxim contained in La. C.C. art.2055 “that no one is allowed to enrich himself unjustly at the expense of another” provides the basis for an action for unjust enrichment. In order to support such an action, the party asserting the claim must *756 show: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and impoverishment; (4) an absence of justification or cause for the enrichment or impoverishment; and (5) no other remedy at law available. United Enterprises Corp. v. Dixon Mortg. Group, Inc., 99-2080, p. 8 (La.App. 4 Cir. 3/1/00), 762 So.2d 43, 47. While the principles of unjust enrichment may support the basis of a claim by Regions against Nine-O-Five, Jane or Joyce if the above enumerated elements are established, we note that Regions did not file a reconventional demand in this case, and thus, such a claim is not properly before this court for review.